**In re GRAND TRAVERSE DEVEL-OPMENT COMPANY LIMITED PARTNERSHIP, Debtor.**

**In re GRAND TRAVERSE DEVELOP-MENT COMPANY, INC., Debtor.**

**In re GRAND TRAVERSE CONDOMIN-IUM DEVELOPERS, INC., Debtor.**

**GRAND TRAVERSE DEVELOPMENT COMPANY LIMITED PARTNERSHIP, Grand Traverse Development Company, Inc., and Grand Traverse Condominium Developers, Inc., Plaintiffs,**

**v.**

**BOARD OF TRUSTEES OF the GENER-AL RETIREMENT SYSTEM OF the CITY OF DETROIT, GRS Grand Hotel Corp., and Grand Traverse Holding Co., Defendants.**

**COMMITTEE OF UNSECURED CREDITORS, Plaintiff,**

**v.**

**BOARD OF TRUSTEES OF the GENER-AL RETIREMENT SYSTEM OF the CITY OF DETROIT, GRS Grand Hotel Corp., and Grand Traverse Development Co., Inc., Defendants.**

Bankruptcy Nos. ST92–83818, to ST92–83820.
Adv. Nos. 92–8348, 92–8585.

United States Bankruptcy Court, W.D. Michigan, N.D.

Feb. 8, 1993.

See also 151 B.R. 792.

Schafer & Weiner, P.C. (Daniel J. Weiner, argued) Birmingham, MI, for debtors Grand Traverse Development Co. Ltd. Partnership, Grand Traverse Development Co., Inc., and Grand Traverse Condominium Developers, Inc.

Clark, Klein & Beaumont (Michael S. Khoury, argued) Detroit, MI, for Board of Trustees of General Retirement System of City of Detroit and GRS Grand Hotel Corp.

Wallace H. Tuttle, Traverse City, MI, for Unsecured Creditors Committee.

Dean Rietberg, U.S. Trustee.

## OPINION REGARDING LIFT OF THE AUTOMATIC STAY, DENIAL OF CONFIRMATION, AND REMAND OF ADVERSARY PROCEEDING

JO ANN C. STEVENSON, Bankruptcy Judge.

### I.  FACTUAL BACKGROUND.

Having reached the watershed point in this joint lift of stay/confirmation hearing, the historical background of this dispute bears repeating.  The principal players in this Chapter 11 consist of undersecured creditor General Retirement System of the City of Detroit ("Retirement System") which is the public retirement system for

the City of Detroit for all current and future city employee retirees except uniformed police and firemen, and the GRS Grand Hotel Corporation, ("Hotel Corp.") a separate corporation set up by the retirement system. These two entities are collectively referred to as the GRS. The Debtors consist of three entities: the Grand Traverse Development Company Limited Partnership ("Partnership"), Grand Traverse Development Company, Inc. ("Development Company"), and Grand Traverse Condominium Developers, Inc. ("Condominium Developers"). The managing general partner of the Partnership is Leisure Real Estate Services Corporation. Attorney Paul Nine is the President of Leisure Real Estate Services Corporation and the associate general partner of the Partnership. The Partnership owns the Grand Traverse Resort Hotel which consists of 425 rooms, 9 restaurants and bars, 80,000 square feet of conference/meeting rooms, 22 retail shops, and two golf courses.

Mr. Nine is President and one hundred percent stockholder of Development Company, a Michigan corporation which holds the liquor license for the Grand Traverse Resort Hotel's bars and restaurants as well as operates all the hotel business pursuant to an operating agreement.

Condominium Developers is a Michigan corporation with all outstanding stock owned, controlled, or held with power to vote by Development Company. As previously stated, Mr. Nine is the one hundred percent stockholder of Development Company. We understand that Condominium Developers is the real estate development and sales component of the Grand Traverse Resort. For ease of reference we refer to the Debtors collectively as "The Resort." Of the three Debtors, only Development Company has an unsecured creditors committee represented by counsel.

The Retirement System originally held a note dated September 25, 1990 in the principal amount of $37,432,404 and related security documents. These documents were ultimately assigned to Hotel Corp. On March 2, 1992 the Massachusetts Mutual Life Insurance Company ("Mass Mutual")

assigned its note in the principal amount of $35 million and related security documents to the Retirement System. When the Debtors defaulted on these loans in January 1992 and the parties were unable to resolve their financial differences, the GRS commenced an action for foreclosure by advertisement in the Circuit Court of Grand Traverse County. On April 16, 1992, minutes before the scheduled foreclosure sale, the Resort filed its first Chapter 11. By operation of law the Chapter 11 filing prevented the GRS from proceeding with its foreclosure suit.

On their April 1992 bankruptcy schedules the Debtors listed the GRS as owed some $47 million. The GRS, however, claims it is owed some $82 million. This debt is the result of both direct loans to the Debtors and the GRS's contractually required purchase of the Mass Mutual debt. Of the $82 million dollars owed, at least $35 million represents GRS' purchase of the Mass Mutual debt. The investment of the limited partners totals some $13 million which amount includes Mr. Nine's contribution.

The Chapter 11 filing generated a flurry of pleadings and hearings. On April 20, the court denied the Resort's motion seeking post-petition credit secured by a lien senior to that of the GRS, *i.e.*, an 11 U.S.C. § 364(d)(1) priming lien. And on April 23, the GRS filed its motion for relief from stay.

During its initial short-lived foray into Chapter 11, the GRS and the Resort appeared to reach an accord that would permit a resolution of its financial differences within the stayed Grand Traverse County Circuit Court suit. Accordingly, On May 1 the Debtors filed their Motion for the Entry of an Order Dismissing Debtors' Chapter 11 Reorganization Proceedings. In hindsight, the following language contained in that Motion to Dismiss may have forecast the eventual future of this case:

Although there is little or no possibility that pre-petition unsecured creditors will be paid *because the Debtor has no reasonable likelihood of rehabilitation and an inability to effectuate a plan*, GRS will continue The Grand Traverse Resort

operation furnishing the unsecured creditors new business and revenue.

(Emphasis supplied).

On May 14, 1992, the court entered a stipulated order granting the GRS relief from stay. The June 3, 1992 Dismissal Order, agreed to by both the Resort and the GRS, was entered after hearing and over the objections and arguments of counsel for the Unsecured Creditors' Committee of Development Company and the U.S. Trustee, among others. According to the terms of the agreement which resulted in the dismissal motion, the GRS was to hire an experienced, professional hotel management company to run the Resort, the foreclosure sale would proceed as scheduled, and the Debtors would be given the opportunity to redeem the property within the six month period for a dollar figure significantly less than the total debt.

All did not proceed as the parties hoped. Difficulties of one kind or another developed. In what now appears to be an aggressive attempt to delay the second foreclosure sale, the Debtors filed a lawsuit in Grand Traverse County Circuit Court (the "lawsuit") seeking, among other relief, a temporary restraining order designed to further forestall the foreclosure sale. That lawsuit claimed, among other allegations, that the Resort had been fraudulently induced into entering into the 1990 mortgage refinance agreements, that the GRS and the Resort were partners and not creditor/debtor, and that damages were incurred during the period Winthrop Hotels, the professional hotel management company retained by GRS subsequent to the mutually consented to dismissal of the first Chapter 11, was active on the Resort's site.

Following oral argument Judge Forester allegedly denied the temporary injunctive relief sought though it appears that no written order to that effect was ever issued. On July 7, again minutes before the foreclosure sale was scheduled to take place and less than three months since undertaking its first venture into Chapter 11, the Resort filed a second Chapter 11. The second filing differed, however, from the first in three respects: the Resort had re-

tained recognized and experienced bankruptcy counsel; the Debtors' proposed Plan of Reorganization accompanied the second Chapter 11 filing; and the lawsuit filed in the Grand Traverse County Circuit Court to delay the second foreclosure was expeditiously removed to this court.

Once again, the GRS quickly countered by filing its Motion for Relief from Stay on July 15. This motion was consolidated with the confirmation of the plan because the Debtors represented that they would be in a position to commence confirmation proceedings quickly and because the court viewed the question of whether the Debtors could confirm a plan as a threshold issue.

Over the GRS' objection we approved the disclosure statement in an order entered October 28, 1992. The valuation hearing was scheduled to take place on November 23 and 24, 1992, and the confirmation hearing was set for the week of November 30–December 4. At the request of the Debtors, the Court scheduled a settlement conference on November 4, 1992. As a result of what the court believed at that time to be good faith settlement negotiations the court withheld disclosure of the report of the court appointed appraiser, Stephen Rushmore of Hotel Valuation Services ("HVS").

When nothing fruitful came of the settlement conference, the appraisal was released, and the valuation hearing commenced on November 23, 1992 as scheduled. At the conclusion of the hearing, the court determined that parcel 1 of the three Resort parcels had a value of $19.6 million, parcel 2 had a value of $2.7 million, and parcel 3 had a value of $2.5 million. An order to this effect was signed on December 4, 1992.

As a result of the delay in the disclosure of the appraisal results, the Debtors claimed that they did not have time to adequately prepare for the valuation and confirmation hearings. Up to this point the Debtors had requested no adjournments and had generally acted as though it was their intention to move as quickly as possible toward confirmation. Nevertheless,

the court was compelled to deny the request for an adjournment as to lift of stay because under 11 U.S.C. § 362 the GRS was entitled to an immediate hearing on its lift of stay motion. Because we think it important, we incorporate by reference but do not here repeat that portion of the court's December 2, 1992 Bench Opinion Regarding Debtors' Motion to Adjourn Final Hearing on Lift of Stay and Confirmation which addresses the timetable of the hearing on lift of stay and confirmation. We do this so as to insure a complete record for the reviewing court.

The court commenced proofs on lift of stay on November 30, 1992. By Friday, December 4, the GRS had met its burden of proving a *prima facie* case on lift of stay. On the morning of December 15, minutes before commencing their defense to the lift of stay and presentation of proof of their ability to confirm their Third Amended Plan of Reorganization filed October 27, Debtors filed their Fourth Amended Plan. Five days later on December 22, the Debtors filed their Fifth Amended Chapter 11 Plan of Reorganization. At this time the court has under consideration this Fifth Amended Plan of Reorganization.

From the beginning this case has been marked by the adversarial nature of the main parties' relationship. We have been called upon to make decisions on a multitude of significant and not so significant issues. (*See, e.g.* October 28, 1992 Opinion re Professional Status of Phillip Fisher; November 30, 1992 Opinion on valuation of the Resort; December 2, 1992 Opinion re Debtors' Motion to Adjourn Final Hearing on Lift of Stay and Confirmation; December 18, 1992 Opinion re Market Rate is Applicable Rate of Interest; December 22, 1992 Opinion Setting Market Rate of Interest at 15%). In addition the court has authored two published opinions in the course of this proceeding: the Consolidated Opinion Regarding Assignment of Rents in *In re Mount Pleasant Limited Partnership,* 144 B.R. 727 (Bankr.W.D.Mich.1992); and the Memorandum Opinion Regarding Shortening of the Exclusivity Period in *In re Grand Traverse Development Compa-*

*ny Limited Partnership,* 147 B.R. 418 (Bankr.W.D.Mich.1992).

Applying these decisions to the plan of reorganization of the moment has been made considerably more difficult as the Debtors have continued to offer oral amendments to their original plan and to file written amendments which do not always coincide with their oral "suggestions" made at trial. To make matters worse and further complicate what has become an unnecessarily complex process these plans are routinely filed and served minutes before the start of the joint confirmation/lift of stay hearings thus making it difficult, if not impossible, for the GRS to respond.

As of this date the Debtors have filed their Fifth Amended Plan which cannot be confirmed. They have further indicated they intend to file another plan. With considerable audacity the Debtors advise the court and the GRS in their Introduction and Amendment to Fifth Amended Plan to the January 28, 1993 Memorandum of Law In Response to Court's Briefing Schedule Order Dated January 11, 1993 ("Debtors' Memorandum"), that:

This Memorandum of Law makes reference to a Sixth Amended Plan of Reorganization. Rather than filing a Plan which may exacerbate the adversarial relationship between Debtors and GRS, the Plan has been withheld from filing at this time. Negotiations are presently underway which Debtors believe are serious and meaningful.

At the February 4, 1993 hearing, counsel for the GRS informed the court that the Debtors made an offer to the GRS which it rejected. Counsel further stated that he would not characterize the settlement negotiations as being at all "serious and meaningful." Counsel for the Debtors countered that a Sixth Amended Plan would be filed within three days.

In an attempt to focus attention on and narrow the remaining threshold issues within the consolidated lift of stay/confirmation hearing, the court prepared and distributed a flow chart to the parties. Having set the market rate of interest at 15% it became apparent that the Fifth Amended

Plan was not feasible if the GRS claims were allowed in full as it amortized the collateralized portion of the GRS' debt at a rate in the 13% range, assuming that negative amortization was permitted, or in the 11% range assuming no negative amortization was permitted. Thus, the only way the Debtors can hope to confirm that, or presumably any other plan is to reduce the amount of the GRS' total claim from $82 million to approximately $15.8 million dollars. The Debtors posture that they can accomplish this seemingly herculean task by succeeding on their pending lawsuit, by reducing the Resort's appraised value of $19.6 million by subtracting some $2.5 million attributed to the Grand Traverse Water Company, or carving out assets from the Resort upon which Debtors claim the GRS has no lien.

Following a January 8, 1993 status conference conducted on the record, the court issued its January 8, 1993 Briefing Scheduling Order listing four issues to be briefed. The briefs have been submitted, read, analyzed and arguments heard and considered. The fourth issue, whether the exculpatory language in the security documents relieved the Development Company of liability to the GRS, was resolved adversely to the Unsecured Creditors Committee in a bench opinion delivered on February 4, 1993. We now address the remaining three issues.

## II. LEGAL CONCLUSIONS.

The Debtors must reduce the lien of the GRS below $15,854,000, *see* Debtors' pleading in response to Scheduling Order entered December 23, 1992 at 24, in order for the plan presently before the court to satisfy 11 U.S.C. § 1129(b)(2)(A)(i)(II).[1] This is the dollar amount the plan will provide to GRS in present dollars based upon the interest rate which the court has determined is applicable. Hypothetically, there are two methods of accomplishing this goal which are available to the Debtors. The

first is to undermine GRS' security so that the portion of its claim for which there is collateral is less than $15 million. The second is to show that there are objections to GRS' claim which reduce it to a level which can be satisfied in current dollars under the payment scheme proposed by the plan. The second of these attacks overlaps from confirmation into the lift of stay matters currently before the court. The GRS has sought relief from stay under §§ 362(d)(1) and (2). It is necessary to determine whether the debtor has equity in this property before a lift of stay may be granted under § 362(d)(2)(A). Thus, the attempt to minimize the GRS' claim *in toto* has dual significance to the Debtors: it is a means of taking the next step on the road to confirmation, and it is also an attack on the GRS' Motion for Lift of Stay.

Because we conclude that the stay should be lifted, we address these overlapping issues in the context of lift of stay.

### A. 11 U.S.C. § 362(d)(2).

We address two bases for lift of stay in reverse order. Section 362(d)(2) provides that the stay may be lifted

> with respect to a stay of an act against property under subsection (a) of this section, if—
>
> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization.

The attack on the collateral position of the GRS goes to the Debtors' ability to effectively reorganize; the attack on the GRS' claim goes to both the equity and reorganization issues.

▪ The burdens of proof as to the different issues are placed upon the respective parties by § 362(g):

> In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—

---

1. This passage states that in order for a plan to be fair and equitable to a class of secured claims, it must provide

   that each holder of a claim of such class receive on account of such claim deferred

cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

(1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and

(2) the party opposing such relief has the burden of proof on all other issues.

While this section identifies who must bear the burden of proof, it does not establish what level of proof is required. The statutory burden has at times been characterized as the "burden of going forward," *see, e.g., Federal National Mortgage Assoc. v. Skipworth (In re Skipworth)*, 69 B.R. 526, 527 (Bankr.E.D.Pa.1987), which we interpret as requiring no more than a preponderance of evidence to carry. However, there is an exception in regard to the burden attached to the § 362(d)(2)(B) issue of necessity to an effective reorganization. Under *United Sav. Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 375–76, 108 S.Ct. 626, 632–33, 98 L.Ed.2d 740 (1988), the Debtors must prove not only that the property is necessary for a reorganization of the Debtors' business (which is certainly true in this case), but that "an effective reorganization ... *is in prospect.*" (Emphasis in original). What may reasonably be "in prospect" can be expected to change depending upon how far the case has progressed.

■ Judge Gregg recently summarized the cases interpreting §§ 362(d)(2)(B) and 362(g) in the wake of *Timbers* in *In re Holly's, Inc.*, 140 B.R. 643 (Bankr. W.D.Mich.1992). He characterized the burden as sliding up a moving scale as the case moves forward. At the outset of the case, the debtor need only show that reorganization is "plausible." In the interim period as the expiration of the exclusivity period approaches the reorganization must be "probable." After the exclusivity period ends and confirmation draws near reorganization must virtually be "assured." *Id.* at 700. The court is mindful that these are "rough" categories, *id.;* nevertheless, at this juncture more than six months after the case commenced and nearly two months since confirmation hearings began, the burden lies heavily on the Debtors to show that confirmation is practically guaranteed. As will become apparent, however, confirmation rests entirely upon Debtors' ability to win a state law suit against the GRS. This frail reed falls short of assuring the court that confirmation is at hand.

### 1. *The challenge to the collateral.*

We start with the argument that the actual collateral of the GRS is worth less than $15.8 million. There is a thicket of issues related to this topic in which the court could become entangled. We resist the temptation to do so by making a series of assumptions for the purposes of this opinion *only*, all of which are favorable to the Debtors and thus adverse to GRS:

1. The plan returns to GRS all real property which is GRS' collateral, except for parcel 1 for which the court established a value of $19.6 million;

2. The GRS has no collateral position in accounts receivable, cash, rents, or any other intangible;

3. The following items are not GRS' collateral, may be deducted from the value of parcel 1, and have the following values: [2]

| | | |
|---|---|---|
| a. | EDC loan | $419,160.61 |
| b. | priority tax liens | 631,163.45 |
| c. | liquor license | 600,000.00 |
| d. | vehicles | 220,400.00 |
| e. | unsold beach units | 300,000.00 |
| f. | beach easement | 100,000.00 |
| g. | beach club | 300,000.00 |
| h. | general manager's unit | 275,000.00 |
| i. | Governor's Suite | 300,000.00 |
| j. | Presidential Suite | 325,000.00 |

The total amount of these items is $3,470,724.06.

We make these assumptions without adopting them as fact. But even were these facts determined after hearing by the court, the GRS would still have collateral in the amount of $16,129,275.94. Without

---

2. The Debtors acknowledge in Debtors' Memorandum that these values are only "guesstimates:"

The actual values for each "slice" of the pie will only be known after appraisals are complete, evidence is admitted and this Court determines what GRS' interest is in the property.

Debtor's Memorandum at 4.

further reduction, the Debtors therefore would have gained nothing in their attempt to undermine the GRS' collateral position; $16.1 million is still in excess of $15.8 million and therefore the plan would not yet satisfy the 11 U.S.C. § 1129(b)(2)(A)(i)(II) requirement that the GRS receive payments "of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest" in the Resort.

The Debtors therefore claim that they are entitled to deduct an additional $2.5 million from the appraised value of parcel 1 for "water rights." The argument, made with great vigor, is that because the Resort complex currently receives water at cost, and because the water is supplied by the Grand Traverse Water Company ("Water Company") which in turn is controlled by Paul Nine, the Debtors' principal, a future owner of the Resort other than the Debtors will be charged an extra amount for profit for the Water Company. Currently profit is being accrued by the Debtors but not paid.

The Debtors estimate that the value of future water contract concessions reaches the $2.5 million mark. However, the Debtors also state in Debtors' Memorandum at 20 that the Water Company's accrued profits amount to $292,000. The court therefore makes a fourth assumption that the only claim that the Water Company currently has against the estate is worth at most $292,000. This assumption is the most favorable to the Debtors possible on this issue. A review of the court file revealed that no attorney has appeared on the Water Company's behalf, and it has filed no proof of claim. However, Debtors did schedule the Water Company as a creditor owed $16,336.90 on Schedule F (unsecured non-priority claimants) in the Grand Traverse Development Company, Inc. (ST92–83819) case.

The Debtors deduct this $2.5 million from the appraised value on the theory that these water rights are not part of GRS' collateral and therefore the GRS is not entitled to a claim for the water rights: "The right to receive water service *at cost* (without profit) is a tangible benefit which must be separately valued since it is separately owned." Debtors' Memorandum at 10 (emphasis in original).

The item of water rights has three possible points of relevance in this case: valuation of the Resort, determination of the interest rate to be used in discounting payments to the GRS to present value, and determination of the scope and extent of the GRS' lien. We address these *ad seriatim.*

### a. Collateral attack on valuation.

We first turn to the argument that the value of the Resort has been determined in error. Counsel for the Debtors argued and the GRS does not dispute that the fact that the Water Company could charge a profit in the future was not conveyed to the HVS appraiser Stephen Rushmore when he prepared his appraisal; the appraisal was adopted virtually in its entirety by the court. Counsel also claims that Mr. Rushmore would change his conclusion of value if his assumption that water would continue to be provided at cost was proved incorrect. However, assuming the doctrine of law of the case applies, this argument is barred as a matter of law. The application of the law of the case doctrine of interlocutory orders in the trial court is necessary in order to effectively dispose of the case in stages. As stated in 3 J. Moore, *Moore's Manual* § 30.03[2]:

Under Rule 56(a), (d), and Rule 42(b), the district court exercises a broad authority to dispose of cases in stages. These decisions are interlocutory in character and until entry of judgment, they remain subject to change at any time. The doctrine of law of the case does not limit the power of the court in this respect. Yet the very purpose of deciding some issues ahead of others is to aid in the logical and orderly disposition of the whole. It would be utterly destructive of this end if each successive decision resulted in the reconsideration of every previous one, and the sequence of decisions in the same case is based on different views of overlapping issues of law would likely

result in an internally inconsistent judgment. To avoid this dilemma, it is the practice to treat each successive decision as establishing the law of the case and to depart from it only for convincing reasons.

(Footnotes omitted). While the application of the law of the case doctrine is discretionary, there are compelling reasons for its application here. We are in the midst of a combined lift of stay and confirmation hearing. While confirmation may be an expansive proceeding, the hearing on lift of stay is supposed to be expedited. Nevertheless, this hearing has been pending for nearly two months. Under these circumstances this court will in its discretion apply the law of the case doctrine unless the most compelling reasons are given for it to do otherwise. The court concludes that the Debtors have failed to make any such showing.

GRS has correctly identified the narrow exceptions to the law of the case doctrine. As stated in *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 657 (Fed.Cir.1985):

The doctrine [of law of the case] precludes [the reconsideration of an earlier decision] unless one of three "exceptional circumstances" exists: the evidence in a subsequent trial was substantially different; controlling authority has since made a contrary decision of law applicable to such issues; or the decision was clearly erroneous, and works a substantial injustice.

This opinion was subsequently adopted by the Sixth Circuit in *Coal Resources Inc. v. Gulf & Western Industries*, 865 F.2d 761, 767 (6th Cir.1989). The new evidence exception cannot apply in this case because a prerequisite to allowing new evidence to merit deviation from law of the case is that the party asserting the new evidence could not have discovered that evidence by reasonable diligence. Clearly Mr. Nine who was present throughout the valuation hearing had knowledge of the facts relating to the Resort's water expense at that time, rendering this exception inapplicable.

The Debtors nevertheless attempt to avoid the law of the case doctrine in this matter by arguing that the earlier ruling was either clearly erroneous or would work a manifest injustice. Neither exception is present here. The issue of clear error goes not to findings of fact, but to conclusions of law. *Moses v. Business Card Express, Inc.*, 929 F.2d 1131, 1137 (6th Cir.1991). This court is aware of no clear error of law that was committed. More fundamentally, the error complained of must be the court's in order for the exception to apply. Obviously, the court need not deviate from a prior ruling because a party made an error in presenting its case. This is exactly the situation here.

At hearing counsel for the Debtors took pains to remind the court that judges like lawyers are also human and thus prone to err. Counsel suggested that the court should be big enough to admit when it makes a mistake. We are the first to admit our errors if we believe one has been committed. But the challenge to the court's determination of value is not based upon some clear error by the court in reaching its conclusion. The court could not determine that one of Mr. Rushmore's underlying assumptions may have been flawed if the Debtors did not make the court aware of the facts contradicting that assumption at the appropriate time. The issue of the value of the Water Company did not arise until the interest rate hearing, when the Debtors asserted that the contribution of this asset to the plan would have the same impact upon GRS' collateral position as a downpayment. The only error is therefore Debtors' in failing to raise the value of the Water Company, or rather the Water Company rights, as an issue in the valuation proceedings. Whatever the reason for this error, it is not the kind of "clear error" which would warrant deviation from the law of the case doctrine now.

The issue of manifest injustice favors GRS, not the Debtors. Like the Debtors, GRS submitted evidence at the valuation hearing and it too had objections to the result reached by the court in concluding that the fair market value of parcel 1 was $19.6 million. However, that determination

having been made, GRS has conducted itself as though it was bound by it. To allow the Debtors to attack the valuation while barring GRS from doing so is patently unfair. Neither party may relitigate their objections now through the course of lift of stay and confirmation proceedings. Accordingly, to the extent we have not previously done so, we now hold that the Debtors are barred from raising proofs as to the value of the Water Company by the doctrine of law of the case, at least so far as that value relates to the value of the Resort or the extent of GRS' claim.

### b. Attack on the interest rate.

■ The second point of relevance is the context in which the issue was first raised: the determination of the interest rate which must be utilized to discount the payments proposed under the plan to present value for purposes of § 1129(b)(2)(A)(i)(II). Through C.P.A. Jack Reinhart the Debtors attempted to present proofs of the value of the Water Company because it was proposing to add a lien upon this asset to GRS' collateral, which it contended would have improved the hypothetical loan to value ratio used in determining the appropriate interest rate. It is true that counsel for the GRS made an offer of proof representing to the court that the Water System Governance Agreement did not permit the Water Company to charge a profit, and that this representation was made in error.[3] In keeping with Debtors' admonition, we will accept the possibility that we may have erred in accepting the GRS' offer of proof which was made in this regard, notwithstanding the fact that Mr. Nine and his attorneys stood mute while this offer was made.

The Debtors may not wish us to be so gracious, however. At the valuation hearing the court deemed inadmissible Mr. Reinhart's testimony to the extent it was offered to show the value of the Water Company because he was not an appraiser. Lacking any other competent proofs as to

the value of the Water Company, the court refused to accord any value to this contribution. On the other hand, the conclusion that the Resort's net operating income (NOI) would decrease as a result of the additional expense represented by an increased water cost requires no expert testimony. Lower NOI means that there would be less available for debt service. We suspect that were we to reopen proofs on this issue the negative impact of this expense on debt coverage would lead us to adopt an even higher interest rate. Under these circumstances we conclude that the water rights as they relate to the interest rate determination does not help the Debtors in reducing the value of the GRS' collateral position.

### c. Deduction of the water rights from GRS' collateral.

■ The Debtors put the most emphasis on their argument that the water rights reduce the value of the *GRS's interest* in the Debtors' interest in the Resort. This argument is clearly flawed.

The determination of market value presupposes a hypothetical sale at a sale price fixed by court order of $19.6 million. Assuming that there are no other objections to GRS' claim, and that GRS's claim is properly perfected, GRS is entitled to the entire $19.6 million less any lien or secured claims of higher priority. Assumption # 3, above, presupposes that there are a number of claims falling into one or the other of these categories. However, there is no such claim against the estate on the Water Company's behalf which would take priority over the GRS' secured claim.

At oral argument the Debtors argued that the court should envision a hypothetical closing on the sale of the Resort for $19.6 million. The court agrees that this is an appropriate method of analyzing the impact of the water rights issue. The $2.5 million attributed to the Water Company represents profits to be taken in the future under a preexisting contract. At closing in

---

3. The court finds this error excusable given the fact that the GRS learned for the first time that the water rights issue would be raised on the

morning of the hearing on setting the interest rate.

the hypothetical sale, the Water Company would not be entitled to a distribution of $2.5 million for its future profits, nor would the Debtors be entitled to retain $2.5 million from the closing proceeds for "water rights" before the GRS was paid. The Debtors admitted as much when they scheduled the Water Company as a non-priority unsecured creditor holding a nominal claim in the Development Company case only.

The Debtors argue that because the appraisal value assumed that the property would continue to receive water at cost, at closing the purchaser would have to prepay for the "right" to continue to receive water at cost in order for this assumption to remain true. We disagree. The *fact* that Mr. Rushmore may have made an assumption regarding future expenses is not law of the case; the *conclusion* of value reached by the court is.

To look at it another way, there are three types of parties who might be entitled to take home some of the sale proceeds: 1) parties owed for transactional costs; 2) lien holders; and 3) equity holders. The Debtors are correct that parties other than the GRS may receive some of the hypothetical sale proceeds, but in each case it is because that party either provided some service in connection with the sale, such as brokerage or title work, or it holds a more senior lien. The Water Company, on the other hand, merely possesses a contract right. Because the sale is for a going concern, whatever contract rights the Debtors may have possessed will be conveyed to the purchaser, but this does not entitle the Water Company to appear at closing and demand prepayment of its future profits for some indeterminate period. The effect of a potentially erroneous assumption in the valuation, once the valuation order is final, is akin to a mistaken assumption made by the purchaser at the time the purchase agreement is signed. The fact of the mistake simply means that the purchaser may have an additional unanticipated cost. Any other conclusion would implicitly require that we rewrite the "purchase agreement," in this case the valuation order. This we refuse to do.

For these reasons the court concludes that the Debtors' attempt to undermine the GRS' collateral position fails as a matter of law.

### 2. *The challenge to the claim.*

We now move to the second level of attack, that the GRS' claim should be reduced below the $15.8 million level due to various theories of lender liability, fraud, "special relationship" and partnership. At the January 8, 1993 pretrial conference the parties agreed that the adversary proceeding commenced by the Debtors in order to resolve these issues would take at least a month to try and would take extensive discovery to prepare. Based on this fact, it is quite apparent that this court will be unable to make any determination on the merits of the objections to GRS' claim at this point in the proceedings. Confirmation must be held in abeyance until these issues are resolved.

The court therefore turns directly to the question of relief from stay. Initially, the court refrained from ruling on many of the issues raised in the relief from stay motion brought by GRS, viewing the issue of whether the Debtors were able to effectively reorganize within a reasonable period of time as being paramount. However, given the fact that the Debtors cannot now continue with confirmation and will not be able to do so for the foreseeable future, the court believes it is now appropriate to turn to other issues raised in connection with lift of stay. The foremost issue is whether this adversary proceeding must be resolved before the court can lift the automatic stay. The court concludes that it need not resolve the adversary proceeding. This conclusion is principally founded upon the legislative history of § 362(d) which states as follows:

> The action commenced by the party seeking relief from the stay is referred to as a motion to make it clear that at the expedited hearing under subsection (e), and at hearings on relief from the stay, the only issue will be lack of adequate protection, the debtors' equity in the property, and the necessity of the property to an effective reorganization of the

debtor, or the existence of other cause for relief from the stay. This hearing will not be the appropriate time at which to bring in other issues, such as counterclaims against the creditor, which, although relevant to the question of the amount of the debt, concern largely collateral or unrelated matters. This approach is consistent with that taken in cases such as *In re Essex Properties Limited,* 430 F.Supp. 1112 (N.D.Cal. 1977), that an action seeking relief from the stay is not the assertion of a claim which would give rise to the right or obligation to assert counterclaims. Those counterclaims are not to be handled in the summary fashion that the preliminary hearing under this provision will be. Rather, they will be the subject of more complete proceedings by the trustee to recover property of the estate or to object to the allowance of a claim. However, this would not preclude the party seeking continuance of the stay from presenting evidence on the existence of claims which the court may consider in exercising its discretion. What is precluded is ´ a determination of such collateral claims on the merits of the hearing.

S.Rep. No. 989, 95th Cong., 2nd Sess. 55, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5841. Courts interpreting this history have distinguished between "direct" defenses which go to the three statutory issues of cause, lack of equity, and necessity to an effective reorganization, and "indirect" or "extraneous" defenses which attempt to establish equity in the debtor by asserting a counterclaim or right of setoff against the secured creditor. *In re 200 Woodbury Realty Trust,* 99 B.R. 184, 185–86 (Bankr.D.N.H.1989).

At the outset we note that all of the defenses asserted by the Debtors must be indirect. This is so because the GRS is actually two creditors, GRS Grand Hotel Corp. and the Retirement System. The mortgage held by the Retirement System was taken by assignment from Mass Mutual, while GRS Grand Hotel Corp. is the assignee of the Debtors' original obligation to the Retirement System. There is no dispute as to the validity of the Mass Mutual claim as it stood prior to assignment, nor is there any challenge to the validity of the assignment itself. Finally, there is no dispute that the Mass Mutual debt is in excess of the appraised value of the entire Resort; the Debtors admit that no payments against the $35 million principal have ever been made. Therefore, the Mass Mutual portion of the overall claim is subject to attack only by way of setoff.[4]

The parties have presented numerous cases interpreting § 362(d)(2) regarding the scope of the hearings to be held by the court. Debtors characterize the cases as falling into two lines, one of which takes a narrow view of the scope of a lift of stay hearing, and the other giving the hearing a more expansive ambit. The Debtors assert that the latter is the emerging view which is now the majority position. However, it is not this court's task to count the number of cases and follow those which constitute the majority. Whether there is a distinction between the cases or not, it is this court's task to glean as best as possible the legislative intent and apply that to the case at hand.

■ We therefore start with the directive of the legislative history that a lift of stay hearing (1) is not the appropriate time in which to consider the full blown merits of defenses not directly related to the three statutory issues; and (2) the extent to which evidence on indirect defenses may be admitted is a matter left to the court's discretion. While the court in *RTC v. Shehu (In re Shehu),* 128 B.R. 26, 29

---

**4.** We note that the question of whether the GRS is in fact a partner of the Debtors is a direct defense against the original GRS obligations. But this too affects the Mass Mutual obligation only as a source of a potential setoff. The defenses of fraud and "lender liability" appear to be indirect as to the GRS obligations as well as the Mass Mutual obligations. This leaves only the claims arising out of Winthrop's management of the Resort. This is the only claim against the GRS which arose after the assignment of the Mass Mutual debt. Putting aside our initial skepticism regarding the merits of this claim, this is by nature an indirect defense and therefore likewise does not require full adjudication prior to lift of stay.

(Bankr.D.Conn.1991) did state that, "Debtors should not be forced to appear in state court foreclosure actions where they clearly would be permitted to raise their defenses seeking to eliminate or reduce the debt," [5] the *Shehu* court could not limit the discretion we have in determining whether it is appropriate to lift the stay before a full adjudication on the merits of the Debtors' claims against the GRS can be had. This court believes that the extent to which it is appropriate to proceed on the merits of an adversary proceeding commenced by the Debtors against the creditor seeking a lift of stay must remain a fact specific determination to be made on a case by case basis.

Judge Spector provided a starting point for this inquiry in *In re Tally Well Service, Inc.*, 45 B.R. 149, 151 (Bankr.E.D.Mich. 1984) where he stated that:

> The Court fully agrees that a preliminary hearing under Section 362 is not the proper time or place for a full *adjudication* of the trustee's claims against the creditor. Indeed, the trustee admits that such matters are beyond the scope of this proceeding. However, there is a tremendous difference between *adjudication* of the merits and mere *consideration* of counterclaims and defenses. Nothing in the comments of Congress indicates that it intended bankruptcy judges to blind themselves to the existence of factors which might bear on the ultimate resolution of a dispute between a debtor and secured creditor. In fact, just the opposite is true.

(Emphasis in original). While Judge Spector approvingly cited case law comparing lift of stay proceedings to a preliminary injunction hearing, procedurally the matter before him was postured in the context of a motion for summary judgment filed in the lift of stay proceedings. He therefore applied a summary judgment standard of review.

In *United Companies Fin. Corp. v. Brantley*, 6 B.R. 178, 188 (Bankr.N.D.Fla.

1980), the case cited by Judge Spector, the court concluded that indirect defenses such as those brought by the Debtors in this case should be considered in much the same fashion as the issues raised in the granting, modifying, or vacating of a preliminary injunction. This is ordinarily an appropriate burden for the debtor to bear when asserting an indirect challenge to the creditor's claim as a way of establishing that the debtor has equity in the property.

■ However, the foremost concern in exercising this court's discretion must be whether the purposes of the automatic stay would be served or hindered by allowing the stay to remain in force while the merits of the adversary proceeding are litigated in bankruptcy court. Certainly the merits of the adversary proceeding play a part in this determination, but only in this broader context. It may be that even though there is a meritorious claim which would justify a preliminary injunction, the automatic stay is an inappropriate means of barring the exercise of state law remedies by the creditor.

The legislative history defines the purposes of the automatic stay as follows:

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

S.Rep. No. 989, 95th Cong., 2nd Sess. 54–55, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5840–41. These goals are much different from the purpose of a preliminary injunction which is to preserve the *status quo* pending the resolution of a dispute between the parties. *Citizens Concerned for Separation of Church & State v. Denver*, 628 F.2d 1289, 1300 (10th

---

**5.** This court disagrees with this statement to the extent it is interpreted as stating a *per se* rule. Whether a debtor should be "forced" to appear in state court depends upon a multitude of issues, including the relationship the state court issues bear to the overall bankruptcy proceedings, and the merits of the debtor's defenses. If those defenses are weak, the creditor should not be "forced" to stand idly by in bankruptcy court in derogation of its bargained-for rights.

Cir.1980), *cert. denied,* 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981).

On the record already before the court it is clear that, even if the Debtors could establish that they were entitled to a preliminary injunction at this point in time, the policies of the automatic stay would not be furthered by the continuation of that stay as a surrogate for a preliminary injunction. What we have here is a case of the tail wagging the dog. Reorganization hinges completely upon the Debtors' success in this adversary suit. If the Debtors can prevail in the adversary proceeding, they can confirm any number of plans. If the adversary proceeding fails, it has little hope of obtaining more than a liquidation or surrender of its assets. In such a situation, the Chapter 11 case serves as little more than an attaching point for the adversary proceeding which absent bankruptcy would be a state court case. The only advantage gained by the Debtors by being in Chapter 11 is the automatic stay.

By determining whether a preliminary injunction would be appropriate in this case, this court would be doing nothing more than stepping into the shoes of a state court judge and applying state law. In doing so, however, the court perforce ensnares the parties with all the trappings of bankruptcy. Therein lies the problem. Chapter 11 is not structured for an adversarial dispute but instead envisions a consensual attempt to reorganize the debtor's business. This distinction is crucial.

In a traditional lawsuit settlement is an important consideration, but it is secondary to the goal of ascertaining legal rights. In Chapter 11, however, the primary goal is to foster consensual reorganizations; the priorities are reversed. Therefore, the Chapter 11 framework is much less structured than that of an adversary proceeding or state court lawsuit. As such, it is more prone to abuse. While Chapter 11 is pending, interruptions such as motions regarding extension of the exclusivity period, disputes as to cash collateral and rents, valua-

tion of the collateral, the setting of interest rates, and other such items detract from the central issue of whether this creditor's claim is subject to serious challenge by the debtor. With relatively minor exceptions, the dispute in this case has been nothing more than a battle between two parties. And, as a result of these numerous immaterial but time consuming skirmishes, the court is only now reaching the question which would be first asked in a state court suit: whether it is appropriate to issue a preliminary injunction to bar GRS from proceeding with its state court remedies.

We have had months of litigation at the expense of untold thousands of dollars to both parties. Throughout this period, the Debtors have had the breathing spell which the automatic stay envisions; and given the fact that the Debtors have made no payments on this obligation for over two years and have successfully avoided the GRS' efforts to foreclose during this period, the court concludes that the Debtors are in no further need of a breathing spell. It is equally clear that a plan of reorganization will reflect nothing more than the realities which result from the outcome of this litigation. Even the promise to pay unsecured creditors 100% of their claims in the current reorganization plan is evidence of the two party nature of this dispute. The unsecured debts in this case are minuscule compared to GRS' claim and appear to be little more than routine business expenses which were in process at the time the case was commenced. Through their offer to pay these claims in full, the Debtors have attempted to use the unsecured creditors as pawns to validate a cramdown of the GRS debt by creating an accepting class of creditors.[6] A continuation of the automatic stay while this litigation is resolved, therefore, would not have any independent effect of fostering a reorganization beyond that which the granting of an injunction in state court would otherwise have.

Where the issues between the parties are state court issues and the court has deter-

---

**6.** This promise to pay, however, is merely illusory since none of the plans proposed have passed either the feasibility or fair and equitable tests, and while those issues have not yet been reached, the court questions whether they could those tests.

mined that the automatic stay serves no independent purpose except as a substitute for a preliminary injunction, it is inappropriate to engage in a preliminary injunction analysis and in the very process of lifting the stay deprive the state court of the power to make a determination which is central to the litigation which will be before it. If this court engaged in a preliminary injunction analysis, once the stay is lifted the GRS could with some authority argue that the Debtors are collaterally estopped from seeking such an injunction in state court. The appropriate remedy is to lift the stay and remand the adversary proceeding to the state court where a properly raised request for a preliminary injunction can be decided by the proper forum.[7] This court therefore determines that it is appropriate to lift the stay under § 362(d)(2) on the basis that the Debtors have no equity in the property and the confirmation of a plan is not now reasonably in prospect given the litigation which must be resolved before confirmation can proceed. Lift of stay is therefore appropriate under § 362(d)(2).

One final § 362(d)(2) issue deserves mention and that is the extent to which the stay is lifted. Although there have been allegations that the GRS has no lien on certain property, there has been no allegation that it is unperfected on any of the real estate or tangible personal property, save vehicles. The only perfection issues relate to the vehicles and, possibly, accounts.[8] If the GRS has no lien on certain condominium units it has no capacity to foreclose as to those assets. Even if it were successful in obtaining a sheriff's deed on such a property, that deed would not impair the Debtors' interest. We therefore find it unnecessary to address the scope of the GRS' liens and lift the stay as to all real property. The stay will remain as to vehicles and intangibles pending further hearing.

B. 11 U.S.C. § 362(d)(1).

■■■ The court now moves to § 362(d)(1), the question of whether lift of stay is appropriate for cause. The court concludes that lift of stay is indeed appropriate for cause, that cause being the Debtors' bad faith. In this court's opinion denying the GRS' request to shorten the exclusivity period, the court noted that such a reduction was not warranted given "good faith and diligence" of the Debtors in pursuing a plan of reorganization at that point in time. *Grand Traverse Development*, 147 B.R. at 421. Since that date, the evolution of this case has led us to conclude that while good faith on the Debtors' part may have once been present, it is not present now.

■■■ In making this evaluation we start again with the burden of proof, which is upon the Debtors. 11 U.S.C. § 362(g); *In re 266 Washington Associates*, 141 B.R.

7. This court will note that on the record before it, which as Debtor's counsel observes already encompasses some 18 days of hearings (not to mention the nearly infinite pages of briefs, complaints, answers, "position papers," objections, "pleadings," and motions), it would deny a preliminary injunction out of hand. The integration, no joint venture, antipartnership and waiver clauses appear completely enforceable from a contractual standpoint. For Paul Nine, himself an attorney, to stand before the court and, in the face of these provisions which his own counsel assured the GRS were valid, assert that he nonetheless considered the GRS a partner having an oral contract to construct the Country Club of Michigan surpasses belief. This court cannot understand how reliance by an attorney on these alleged oral promises could be reasonable under these circumstances. But far be it from this court to deny the Debtors their right to the full evidentiary hearing on a preliminary injunction. They may have their

day in court—but in Grand Traverse County, not here.

We further note that both the Debtors and the GRS correctly identify the litigation removed from state court to this court as non-core containing neither bankruptcy nor any other issue founded on federal law. Further, pursuant to 28 U.S.C. § 157(c)(1) both parties have refused to consent to this court's entry of final orders or judgments and at the same time both parties have requested a jury trial which we are instructed this court does not have the power to conduct. *Rafoth v. Nat'l Union Fire Ins. Co. (In re Baker & Getty Fin. Serv., Inc.)*, 954 F.2d 1169 (6th Cir.1992). Surely Debtors cannot be heard to complain when they are afforded the forum which they themselves originally selected.

8. The court makes no determination as to the parties rights in intangibles or accounts, including cash collateral and accounts receivable, at this time.

275, 281 (Bankr.E.D.N.Y.1992). This standard holds firm even if the issue is relief from stay for cause based upon an allegation of bad faith. *In re Laguna Associates Limited Partnership*, 147 B.R. 709, 714 (Bankr.E.D.Mich.1992).

■ However, we proceed cautiously where the cause asserted for lift of stay is bad faith. In *Industrial Insurance Services, Inc. v. Zick (In re Zick)*, 931 F.2d 1124 (6th Cir.1991), the Sixth Circuit reviewed the dismissal of a bankruptcy proceeding for bad faith. The court exhibited some circumspection itself:

> Dismissal based on lack of good faith must be undertaken on an *ad hoc* basis. *In re Brown*, 88 B.R. [280, 284 (Bankr. D.Hi.1988)]. It should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence.

*Id.* at 1129. The Sixth Circuit thus compels us not to find bad faith lightly.

In making this inquiry the Sixth Circuit has recently given us guidance in the factors that should be considered. In *Society Nat'l Bank v. Barrett (In re Barrett)*, 964 F.2d 588 (6th Cir.1992) the court concluded that whether bad faith exists is to be determined based upon the totality of the circumstances, citing its earlier opinion in *Metro Employees Credit Union v. Okoreeh–Baah (In re Okoreeh–Baah)*, 836 F.2d 1030 (6th Cir.1988). The *Okoreeh–Baah* case identified at least twelve factors which relate to the bad faith issue summarized by the *Barrett* court. But having stated these factors, the court did not then engage in a point-by-point review of the lower court's decision. Instead it asked a more general question:

> [A]s long as the court sufficiently considered Barrett's prior conduct under the

totality of circumstances test, the exact manner in which the bankruptcy court weighed the prior conduct is irrelevant given the bankruptcy court's discretionary power in making a determination of good faith. *See Okoreeh–Baah*, 836 F.2d at 1033.

*Id.* The court concluded that the bankruptcy court had considered all of the facts and had committed no clear error. The court refrained from making any assessments of the debtor's bad faith in the case before it, instead limiting its inquiry to the question of whether the bankruptcy court properly exercised its discretion.

■ To the extent that there is a conflict between the placement of the burden of proof under 11 U.S.C. § 362(g) upon the debtor and the *Zick* court's admonition that a determination of bad faith is reserved for egregious cases, this court has already exhibited an inclination to err in favor of the debtor, as evidenced by the conclusion we reached in *Grand Traverse Development*, 147 B.R. at 421, where in spite of our finding that there was "a serious question regarding the Resort's ability to reorganize," we made a finding of good faith at that time.[9] Be that as it may, the court is not bound by principles of *res judicata* to find that good faith exists now. *Barrett* instructs that we must evaluate the totality of the circumstances before us. As events progress, additional facts or subsequent conduct may shed new light on the debtor's good faith in pursuing bankruptcy.

Numerous factors upon which other courts have premised a finding of bad faith are present here. In *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir.1988), six facts led the court to conclude that the case was filed in bad faith:

(i) The Debtor has only one asset, the Property, in which it does not hold legal title;

(ii) The Debtor has few unsecured creditors whose claims are small in rela-

---

**9.** The "benefit of the doubt" which we extended to the Debtors cannot be overstated. At the hearing on the disclosure statement the GRS argued that the disclosure statement could not

be approved because confirmation of the plan was impossible. In hindsight there may have been more truth to this statement than the court accorded it.

tion to the claims of the Secured Creditors;

(iii) The Debtor has few employees;

(iv) The Property is the subject of a foreclosure action as a result of arrearages on the debt;

(v) The Debtor's financial problems involve essentially a dispute between the Debtor and the Secured Creditors which can be resolved in the pending State Court Action; and

(vi) The timing of the Debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the Debtor's secured creditors to enforce their rights.

*See also Natural Land Corp. v. Baker Farms Inc. (In re Natural Land Corp.),* 825 F.2d 296, 298 (11th Cir.1987).

The factors listed in *Piccadilly* are present here with only minor variations. While as a result of its size the Resort has more facets than is typical in the garden variety single asset case, this fact is generally significant because of its impact on the creditor body. Where there is only one asset, there is usually also only one or a few secured creditors. The secured creditors will in turn have a dominant role in the debtor's business because they will generally have more money in the venture and their collateral will constitute substantially the entire business. This is certainly true in this case.

The second factor, a relatively small body of unsecured creditors, is present here, where unsecured creditors other than the GRS consist of no more than $4 million worth of trade debt which was in process at the time of filing. This debt is overwhelmed in the shadow of the GRS' claim and appears to represent no more than the claims of those who were caught with outstanding invoices on the date of filing.

The third factor, few employees, is present as to the Partnership. The Development Company does have a significant number of employees, but again this reflects the unusual size of the operation rather than the nature of the case. The preservation of jobs is not at issue as the GRS has advised on several occasions that,

should it be successful in obtaining control of the property, it would continue to operate the Resort as a four star facility in order to preserve its going concern value. Indeed, the first case ended with the GRS attempting to do exactly this.

The fourth factor, that the property is the subject of a foreclosure, is doubly true in this case. The Debtors have filed Chapter 11 not once but twice on the morning of foreclosure. This is a dominant factor in the court's consideration.

The fifth factor, that the Debtors' problem involves essentially a state law dispute, is present and has already been addressed. The court would only add in this context that given the pendency of state court litigation and the repeated filing to forestall foreclosure, the court can now only conclude that bankruptcy has been invoked solely for the benefit of the automatic stay.

The sixth factor, timing of acts which demonstrate an intent to delay, abounds in this case. To start there are the two Chapter 11 filings both of which came hours before foreclosure. Then there is the practice of making oral modifications to the plan at issue as well as filing amendments to the plan on the morning of a hearing in which the amendment will have an impact on the proofs to be presented. This was the case with the Fifth Amended Plan, filed midway through the interest rate hearing. The rumored Sixth Amended Plan likewise evidences an intent to delay. The Debtors' claim that it was withholding this plan because negotiations were underway which the Debtors' considered meaningful is unbelievable. It is far more likely that to have filed the plan would have deprived the Debtors of surprise, an unnecessary implement in settlement negotiations but a vital weapon in a war of delay.

Other factors evidence an intent to delay. This litigation can be marked by the phases through which the Debtors have moved starting with cooperation, then confirmation, then cram-down, then desperation, finally reaching delay. In the initial stages of the case the Debtors moved quickly to file a plan and seek approval of a disclo-

sure statement. This tactic, coupled with an aggressive but unfocused stance by the GRS and recent memory of the previous Chapter 11 captained for the Debtors by what appeared to be inexperienced bankruptcy counsel, led this court to believe that the Debtors were attempting to start fresh and build the foundations for reaching a compromise with the GRS. This impression was furthered by the request for a settlement conference and joint requests by the GRS for a delay in the disclosure of appraisal results while negotiations continued.

When these talks proved unsuccessful, the Debtors changed their goals to confirmation. It quickly became apparent that cram-down was the only way of achieving this goal and thus the Debtors set first foot in the realm of bad faith. Courts have held that use of bankruptcy solely as a means of resolving a two-party dispute is tantamount to bad faith. *See Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670, 674 (11th Cir.1984); *In re Heritage Wood 'N Lakes Estates, Inc.*, 73 B.R. 511, 514 (Bankr.M.D.Fla.1987).

As the valuation and confirmation process moved forward the court made two decisions which can fairly be characterized as having serious negative repercussions for the Debtors, namely the valuation and interest rate conclusions. These conclusions called into serious question the confirmability of any plan bearing similarity to the Third Amended Plan which was initially up for confirmation. At this point, the Debtors should have questioned whether continued bankruptcy proceedings evidenced a real attempt to reorganize, or whether the goal was no longer reorganization but delay.

Whether the Debtors actually asked this question or not, from the valuation hearing forward, the Debtors began fighting a rear guard action to fend off the GRS, rather than moving forward on any realistic confirmation.[10] The stratagem of filing multiple plans is the best evidence of this. Each modification to the plan represented an incremental response to the latest adverse ruling. For example, when it became apparent during the course of interest rate hearings that loan to value ratio was a factor, the Debtors filed a new plan gerrymandering payments to GRS so that there would be a "downstroke" in the form of an acceleration of the first year's payments. This would have an impact on the mathematical calculation of loan to value ratio, but would also place the GRS in a position of receiving no payments at all for eighteen months.

Counsel for the Debtors advises that he intends to file yet another plan. This plan would introduce a new third party investor hitherto not involved in these proceedings. Notwithstanding the provisions of 11 U.S.C. § 1125, counsel insists that a new disclosure statement need not be filed and approved in connection with this plan. Counsel also states, however, that as the presence of this new party will significantly reduce the risk to GRS, the applicable interest rate must also be reconsidered, thus rendering useless the two days of hearings previously conducted by the court to fix the rate now being used. Time is, of course, on the Debtors' side. The Debtors' failure to adjust to the new realities in this case once factual determinations are made is the most significant circumstance of the "totality" which the *Barrett* court instructs us to consider.

■ To the list of factors set forth in *Piccadilly* the court would add that inconsistency of position may also constitute a bellwether of bad faith. For example, in the first case, the Debtors stipulated that

---

**10.** It must be noted that up until the eve of confirmation the Debtors had sought no adjournments and had consistently acted to move the case forward. However, the court believes that the Debtors were not prepared for the possibility that they might not succeed in impeaching the HVS appraisal. Immediately after value was set very close to the HVS result, the Debtors' strategy shifted. They requested their first adjournment at the opening of confirmation and on numerous occasions have complained at the pace of these proceedings, even though they were originally to have been completed in the first week of December. At the most recent hearing the Debtors suggested that the court deny lift of stay for the purpose of ordering yet another settlement conference.

the liens of the GRS were valid and enforceable,[11] in this case the Debtors seek to divest the GRS of its entire claim. In the first suit the Debtors admitted that they could not reorganize; they now insist to the contrary. In the valuation hearing, the Debtors asserted that the Resort was worth $12 million and claimed that a purchaser would give no value to its future performance; yet in each plan of reorganization, the balloon proposed at the end of the plan is greater than the appraised value of the Resort. The source for payment of the balloon and all other payments called for by the plan is the same Resort which Debtors claim has no future value.

We also add that the merit of positions taken in the case may provide some measure of the Debtors' good faith. For example, the first case commenced with a request for a priming lien under 11 U.S.C. § 364(d) which on its face could not satisfy the adequate protection requirement for such a lien found in § 364(d)(1)(B). This court denied this motion in no uncertain terms, but during confirmation the Debtors suggested that this court retain jurisdiction so that a priming lien might be considered in the future. In both instances, there was little if any merit to the position taken, but time did pass while the requests were considered. Other examples abound. There is a wealth of case law stating that negative amortization is not fair and equitable, and therefore impermissible except in the most unusual of circumstances, circumstances which are certainly not present here. Nevertheless, the Debtors have proposed plans which at any reasonable interest rate provide negative amortization of the GRS' claim. The argument regarding the Water Company assets was once raised in a brief stating such a weak claim that it was accompanied by a bold-faced "warning" that it was not what it appeared to be, i.e. an attack upon the valuation. In each of these instances, the merits of the position taken guaranteed additional days of hearings, but promised little in the way of realistically moving this case toward confirmation.

Based upon all of these factors, the court concludes that the Debtors, if they were not earlier, are now proceeding in bad faith. This bad faith constitutes cause for lifting the automatic stay.

## III.  CONCLUSION.

Throughout this proceeding much has been made of giving the Debtors a chance to reorganize. While principles of fresh start are important, it must be kept in mind who has the most at stake here. Paul Nine is one of many investors who have invested some $13 million in this project. The GRS represents workers in the City of Detroit whose pension monies of some $80 million plus were lent to the Debtors for this project. The court notes that the GRS note bears interest at a minimum rate of 7½% and that the Mass Mutual note bears interest at 9.53% with a default rate of 12.53%. Assuming an interest rate of only 7½% and a principal balance of $70 million calculated on a 360-day basis (as both notes require) interest to the GRS would be accruing at a rate of $14,583 *per day*. The court makes no finding as to what the interest expense to the GRS is, but as this illustration demonstrates, time is money. Every day that passes costs the GRS and costs those whose savings are entrusted to the GRS. Under the circumstances, the court has given the Debtors more than enough of a breathing spell, and has had its fill of questionable attempts at reorganization.

The stay will be lifted as to all real property and all personal property except vehicles, intangibles, and accounts, including but not limited to cash and accounts receivable; the adversary proceeding commenced in state court by the Debtors will be remanded from whence it came; and the parties shall appear before the court on March 2, 1993 at 9:00 a.m. to advise the court whether it is in the best interests of the estate to (a) dismiss this case, (b) convert this case to a Chapter 7 proceeding, or (c) appoint a Chapter 11 trustee under 11 U.S.C. § 1104.

The court shall prepare the order.

**11.**  The doctrine of *res judicata* may bar the    Debtor's state law claims on this ground alone.

ORDER LIFTING THE AUTOMATIC STAY, DENYING CONFIRMATION, REMANDING ADVERSARY PROCEEDING, AND SCHEDULING HEARING ON DISMISSAL, CONVERSION, OR APPOINTMENT OF A TRUSTEE

THIS MATTER came before the court for resolution of a number of legal issues addressed by the parties in response to a briefing order issued by the court on January 8, 1993. Oral argument on these issues took place on February 4, 1993, and on February 8, 1993, the court issued its opinion on the issues briefed. For the reasons set forth at length in that opinion,

IT IS THEREFORE ORDERED that the motion for lift of the automatic stay filed by the GRS is granted pursuant to 11 U.S.C. §§ 362(d)(1) and 362(d)(2) as to all real property and all personal property except vehicles, intangibles and accounts, including but not limited to cash and accounts receivable;

IT IS FURTHER ORDERED that confirmation of the Fifth Amended Plan of reorganization is denied;

IT IS FURTHER ORDERED that pursuant to 28 U.S.C. § 1542(b) the adversary proceeding captioned *Grand Traverse Development Company Limited Partnership et al. v. Board of Trustees of the General Retirement System of the City of Detroit et al.*, Adversary Proceeding No. 92–8348 is remanded to the Circuit Court for the County of Grand Traverse, State of Michigan; and

IT IS FURTHER ORDERED that counsel for the Debtors, the Board of Trustees for the General Retirement System of the City of Detroit, the unsecured creditors committee, the United States Trustee, and any other interested parties shall appear at court in Grand Rapids on March 2, 1993 at 9:00 a.m. to advise the court whether it is in the best interests of the estate to (a) dismiss these Chapter 11 bankruptcy cases, (b) convert these cases to Chapter 7 proceedings, or (c) appoint a Chapter 11 trustee under 11 U.S.C. § 1104. The parties are advised that one of these three remedies may be exercised at the conclusion of the hearing.