**In re 160 BLEECKER STREET ASSOCIATES, Debtor.**

**No. 93 Civ. 1033 (PNL).**

United States District Court, S.D. New York.

June 18, 1993.

---

Speno, Goldman, Goldberg, Steingart & Penn, Mineola, NY, for plaintiff 160 Bleecker St. Associates.

Eaton & Van Winkle, New York City, for defendant 160 Bleecker St. Owners Inc.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for defendant Lincoln Sav. Bank.

*Memorandum and Order*

LEVAL, District Judge.

160 Bleecker Street Owners, Inc. (the "Cooperative") appeals from an order of the United States Bankruptcy Court for the Southern District of New York, Blackshear, J., dated January 5, 1993, denying the Cooperative's motion to lift the automatic stay. The Cooperative asserts eight grounds for reversal of the bankruptcy

court's order. The court finds that as a matter of law under § 362(d)(2), the Cooperative is entitled to a lifting of the stay because the debtor has no equity in the property and the property is not necessary to an effective reorganization, and because the Cooperative's collateral is not adequately protected.

## Background

The debtor in the bankruptcy action, 160 Bleecker Street Associates, is a New York partnership of Louis and Peter Evangelista, and was the sponsor of the 1983 conversion of a building at 160 Bleecker Street, New York, N.Y., from a rental property to a condominium. The building contains both commercial and residential space. The residential space, consisting of 189 units, is organized as a cooperative known as 160 Bleecker Street Owners, Inc., which is the appellant. The debtor was unable to sell 106 of the 189 apartments; the corresponding stock shares relating to the 106 units were retained by the debtor. The Cooperative holds first lien on the debtor's shares, and asserts claims in a sum of over $2 million, arising from unpaid maintenance obligations and other charges.[1]

In 1983–84 and 1988, the sponsor obtained two loans from Manufacturers Hanover Trust Company, for approximately $1,439,727.47 and $4,341,640.34, respectively. The loans were secured by pledges of shares and assignments of proprietary leases for the apartments. In addition, Louis Evangelista, the sponsor's principal, obtained a $1.3 million loan in 1986 from Fidelity New York FSB, secured by a pledge of shares and assignment of leases for sixteen of the apartments.

The Cooperative asserts that the sponsor mismanaged the apartments, improperly diverted $125,479.42 from the Cooperative's accounts to pay for water and sewage charges owed by the sponsor-owned commercial portion of the premises, allowed serious safety and fire code regulations to occur, and fell into default on its maintenance obligations to the Cooperative.

The proprietary lease between the Cooperative as lessor and the Sponsor as lessee provides that the leases are to be automatically terminated on the date set in any notice of default served on the lessee, unless the default is cured within 10 days of such service. Paragraph 31(d) of the proprietary lease provides:

> If the Lessee shall be in default for a period of one month in the payment of rent or additional rent or of any installment thereof and shall fail to cure such default within ten days after written notice from the Lessor, the term of the lease shall expire.

Once the lease is automatically terminated under this provision, the lessee

> shall surrender to the corporation the certificate for the shares of the corporation owned by the Lessee to which this lease is appurtenant. Whether or not said certificate is surrendered, the Lessor may issue a new proprietary lease for the apartment and issue a new certificate for the shares of the Lessor owned by the Lessee.... Upon such issuance the certificate owned or held by the Lessee shall be automatically cancelled and rendered null and void.

On August 28, 1989, the Cooperative served the sponsor with a notice of default for unpaid maintenance obligations. In December 1989, the New York Supreme Court

---

**1.** The debtor argues that the Cooperative's claims are actually 106 separate claims on each apartment and that, depending on the value of the individual unit and the amount of arrearages owed on that unit, each claim may be secured or unsecured. (It does not appear that the debtor made this argument before the bankruptcy court.) However, the By-laws of the Cooperative state:

> The Corporation shall, at all times have a first lien upon the shares owned by each shareholder for all indebtedness and obligations

> owing and to be owing by such shareholder to the Corporation, arising under the provisions of any proprietary lease issued by the Corporation and at any time held by such shareholder or otherwise arising.

It thus appears that the Cooperative holds all the shares in aggregate, and that its claims are cross-collateralized. In any event, this dispute does not affect the result of the present opinion, which in either case would require vacating the stay.

(Pecora, J.) denied the sponsor's motion for a yellowstone injunction (to block the Cooperative from terminating the sponsor's proprietary leases). On January 3, 1990, the Cooperative served on the sponsor a notice of termination of its proprietary leases effective January 9, 1990, and demanded the surrender of the corresponding shares. The sponsor did not cure its default within the prescribed period.

The Cooperative served notice that it would sell the apartments at public auction. The sponsor and MHTCo. moved for a preliminary injunction to block the sale. On August 10, 1990, the New York Supreme Court (Huff, J.) denied the motion. Justice Huff held:

> The defendant cooperative neither has physical possession of the shares of stock, nor has it filed a UCC financing statement against the shares. However, the defendant enjoys the right to cancel the plaintiff's shares and re-issue new ones.

In denying the request for an injunction, Justice Huff wrote: "When members of a cooperative default, it becomes impossible for the cooperative to meet its financial obligations, and it faces foreclosure. The members of a cooperative are reliant upon the financial strength and honesty of their fellow members."

In March 1990, MHTCo. filed two actions against the debtor seeking to sell the shares and leases in which it had a security interest. In August 1990, Justice Huff ordered the appointment of a receiver for the apartments.

On January 4, 1991, the debtor and several affiliates filed petitions for relief under Chapter 11 of the Bankruptcy Code.[2] The filing stayed the state court actions and the proposed sale of the apartments. The sole asset of the debtor is the apartment building at 160 Bleecker Street.[3] On August 9, 1991 the Cooperative filed a motion in the bankruptcy court to dismiss the bankruptcy case or vacate the automatic stay in order to sell the 106 units at public auction.

In the meanwhile, Evangelista made some progress towards improving the cash flow from some of his properties, including the apartments, and worked towards settling the claims of his largest creditor, Manufacturers Hanover Trust Co. On November 25, 1991, the bankruptcy court approved a global settlement agreement among the debtor and its affiliates and MHTCo. Under the settlement, MHTCo. agreed to reduce its claim against the debtor from $7 million to $2.5 million, conditioned on the debtor's confirmation of a plan of reorganization. The settlement also dealt with certain judgments obtained by MHTCo. and the debtor's and affiliates' principals, and released or discharged certain guarantees by these principals.

From August 1990 to April 1992, the premises were under the management of a state court appointed receiver. According to the debtor, the receiver caused pre-petition arrears of approximately $159,832.71 and post-petition arrears of approximately $364,136.00. In April 1992, the bankruptcy court ended the receivership and returned control of the apartments to the debtor.

The Cooperative, in the meantime, because of the debtor's accumulated arrears and protracted litigation, became unable to make timely and full mortgage payments to Lincoln Savings Bank, a mortgagee, as well as property taxes, and water and sewer charges owed to New York City. Lincoln holds a mortgage in the principal sum of $4.5 million on the premises at 160 Bleecker Street. On July 26, 1991, Lincoln commenced a foreclosure action against the Cooperative in state court.

On October 9, 1991, the debtor, as a shareholder of the Cooperative, commenced an adversary proceeding in bankruptcy court to enjoin Lincoln from prosecuting the foreclosure action. The debtor obtained a temporary restraining order preventing Lincoln from foreclosing on the property. Lincoln agreed to continuation

---

**2.** The related affiliates include 155 West 73rd Street Realty Corp., Denlou Realty Corp., Pedemonta Realty Corp., and Canz Realty Corp.

**3.** One of the principals of the debtor and several related affiliates have other real estate holdings.

of the restraining order during trial of the Cooperative's motion to dismiss the bankruptcy action or vacate the automatic stay.

On March 26, 1992, the debtor filed a second amended plan of reorganization and a second amended disclosure statement. Under the proposed plan, the debtor would be consolidated with its affiliates. The affiliates' properties (the "Brownstones" or the "West Side Properties") would be sold.[4] The proceeds of the sale would be used to satisfy the claims, in full, of the affiliates' creditors, and any balance remaining would be go toward the Cooperative's claim. If the balance failed to satisfy the Cooperative's claim, "an outside source" would provide the requisite funds. Payment would be made "as soon as practicable" after confirmation. MHTCo. would be paid according to the terms of the global settlement agreement. Fidelity would receive nothing. Unsecured claimants would be paid "at a later date."

The plan calls for "a rapid sale of the West Side Properties followed by long term liquidation of the 106 apartments at 160 Bleecker." As to the sale of the apartments at 160 Bleecker, the plan states that it "has been estimated that the period required to sell all the apartments may take as long as twenty years. However, as set forth below, the Debtors believe it can accomplish this in a much shorter time period."[5]

The bankruptcy court held hearings in November 1991, and in February, March, and April 1992.

At the hearings, the Cooperative offered evidence that the value of the 106 apartments was $1.6 million in October 1991 and $1.0 million in February 1992. MHTCo.'s expert valued the apartments at $1.7 million in October 1990. The debtor's expert valued the apartments at $3.34 million. However, this valuation failed to take account of the long period apparently necessary to sell the apartments, or that shares

of 16 of the apartments valued at approximately $600,000 are pledged to Fidelity FSB, that Local 10 and fire code violations exist, that there had been rent strikes, that the mortgage was in arrears, or that maintenance charges had increased.

Also at issue in the hearings was the value of the Cooperative's claim. The Cooperative contends the claim exceeds $2 million. The debtor estimates the claim (pre- and post-petition) to be close to $1 million. The undisputed portion of prepetition principal owed is approximately $451,000. The Cooperative introduced the testimony of an accountant who calculated sums owed. The accountant stated that as of February 1992, the sponsor's maintenance arrears were $931,000. (The debtor does not dispute this amount). The interest on unpaid maintenance, calculated at the contract rate (which is the maximum legal rate of 24 percent per year), was $548,481.68, as of February 1992. Water and sewer charges improperly caused to be paid by the Cooperative for the benefit of the debtor as owner of the commercial portion of the premises, as of December 1990, were $125,479.42. (The debtor does not dispute the amount, but states that independent managers, not the sponsor, were responsible for the improper transfer. The Cooperative counters that the sponsor was in control of the Cooperative Board of Directors at that time and hired the managing agents.) The debtor stipulated to accounting fees owed of $10,000. Late charges due Lincoln Bank amounted to $9,000 as of February 1992, which charges are attributable to the sponsor under paragraph 28 of its proprietary leases. On April 14, 1992, the bankruptcy court found that the Cooperative's reasonable attorneys' fees and expenses as of February 29, 1992 were $589,574.29. (The debtor states that the bankruptcy judge did not determine whether the attorneys' fees and ex-

---

4. The seven Brownstones are located at 102 West 76th Street, 155 West 73rd Street, 106 West 80th Street, 302 West 90th Street, 329 West 84th Street, 232 East 13th Street, and 131 West 88th Street.

5. At one point in its plan, the debtor estimates that the sale of all 106 units would occur in five years; at another point, the debtor estimates 10 years.

penses were part of the Cooperative's secured claim.)

After conclusion of the trial hearings, but before any decision, Lincoln requested that its cross-motion to dismiss the adversary proceeding and vacate the TRO be heard. The Cooperative's motion to intervene was granted. Judge Blackshear dissolved the TRO and dismissed the complaint against Lincoln by order of July 31, 1992. The Cooperative (but not the debtor) appealed from that order and sought a stay pending appeal.[6]

By order dated January 5, 1993, Judge Blackshear denied the Cooperative's motions to dismiss or to vacate the stay, holding that the Cooperative is not entitled to relief from the stay, because: (1) the debtor's right of redemption in the apartments is property of the estate under § 541(a)(1) and the debtor's rights were not extinguished by the state court rulings; (2) the proprietary leases are not deemed rejected under § 365(d)(4) because the units are residential; (3) the Chapter 11 petition was not filed in bad faith, and (4) although the debtor has no equity in the property, the apartments are essential to an effective reorganization under § 362(d)(2).

The bankruptcy court did not determine the value of the Cooperative's claim, the value of the apartments, the applicable post-default interest rate, the amount of interest owed, the amount of accountant's fees, late charges and expenses owed, and the amount of vault and water charges payable to the Cooperative.

On January 22, 1993, the Cooperative appealed from the bankruptcy court's order.

Although from May 1992 to February 1993, the debtor made a significant portion of current monthly maintenance payments to the Cooperative, which Lincoln and the debtor assert total almost $575,000, the debtor's maintenance arrearages continued to grow. Since April 1, 1991, the Cooperative has made no payments to Lincoln, and its tax arrearages grew to over $1 million. Lincoln has stated its intention to move in state court for the appointment of a receiver.

### Discussion

On appeal from the bankruptcy court, the district court reviews conclusions of law *de novo;* factual findings will not be disturbed unless they are clearly erroneous. *In re PCH Assocs.,* 949 F.2d 585, 597 (2d Cir.1991). Mixed issues of fact and law are reviewed *de novo. In re CIS Corp.,* 142 B.R. 640, 641 (S.D.N.Y.1992).

While the Cooperative raises eight challenges to the ruling of the Bankruptcy Court, clearly the most significant contention is that the Cooperative is entitled to a lifting of the automatic stay with respect to its efforts to foreclose on its collateral under the provisions of § 362(d)(2) of the Bankruptcy Code.

Section 362(d)(2) provides:

... the court shall grant relief from the stay provided under subsection (a) of this section ... if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

■ The party opposing relief from the stay has the burden of proof on all issues other than the debtor's equity in the property. 11 U.S.C. § 362(g). Once the movant shows that the debtor has no equity in the property, the burden shifts to the debtor to establish that the property is "necessary to an effective reorganization" and that there is "a reasonable possibility of a successful reorganization within a reasonable time." *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 376, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988) (internal quotations and citation omitted). The debtor must show "not merely that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect." Id.* (emphasis in original).

---

**6.** The Cooperative's appeal of the order regarding Lincoln Bank is treated in a separate ruling.

■ The test is one of feasibility. The debtor need not show that the plan is confirmable, *In re East–West Assocs.*, 106 B.R. 767, 774 (S.D.N.Y.1989), but that "the things which are to be done after confirmation can be done as a practical matter." *In re Ritz–Carlton of D.C., Inc.*, 98 B.R. 170, 172 (S.D.N.Y.1989) (Walker, J.) (*quoting In re Fenske*, 96 B.R. 244 (Bankr.D.N.D. 1988)). "A motion for relief from the stay should not be turned into a confirmation hearing; the debtor need only show that where there is lack of equity, the proposed plan has a realistic chance of being confirmed and is not patently unconfirmable." *In re White Plains Dev. Corp.*, 140 B.R. 948, 950 (Bankr.S.D.N.Y.1992) (citation omitted).

■ The debtor's burden of establishing "a reasonable possibility of a successful reorganization within a reasonable time" increases as time passes over the course of proceedings. *In re Ritz–Carlton*, 98 B.R. at 172 (citations omitted); *In re Grand Traverse Development Co., Ltd. Partnership*, 150 B.R. 176, 183 (Bankr.W.D.Mich. 1993) ("what may reasonably be 'in prospect' can be expected to change depending upon how far the case has progressed.")

■ The purpose of the automatic stay provision of the bankruptcy code is to provide debtors with temporary respite from their creditors so that they may have the opportunity to develop and implement plans of reorganization to satisfy their creditors and resuscitate their businesses. However, the Bankruptcy Code does not provide debtors with license indefinitely to delay payment to their creditors. Long periods of delay in developing and implementing plans of reorganization have the potential to cause serious financial harm to creditors, perhaps forcing them into bankruptcy themselves. As one commentator has stated, "Restraining creditors from enforcing their rights is strong medicine. The Bankruptcy Code does not sanction the stay for the stay's sake." M. Bienenstock, Bankruptcy Reorganization 135 (1987).

The bankruptcy court found that the debtor has no equity in the property. Accordingly, the debtor had the burden of proving the reasonable feasibility of its plan of reorganization and that the apartments were necessary to that plan. The Bankruptcy Court found in favor of the debtor on these issues.

■ With respect to the reasonable feasibility of the plan, the bankruptcy court's finding was entirely conclusory.[7] It was not explained, and was not supported by any specific findings relating to the market values, the amount of the debt or any of the necessary particulars. Nor did the bankruptcy court make any findings as to how, or under what circumstances, the reorganization plan could succeed. In the view of this court, the finding of feasibility is incompatible with the evidence.[8]

What is clear is that this plan comes down to nothing more than a speculation on the future values of New York residential real estate—a speculation in which all the risk will be borne by the Cooperative, to finance the debtor's hope of recouping equity if the market rises significantly in the years to come.

It appears that the debtor's assets are insufficient to cover the debt. The Plan furthermore provides no reasonable, feasible way for the debtor to satisfy the debt. Although the Plan calls for sale of the 106 apartments in 5 years, the debtor's expert estimated that the sale would take as long

7. Addressing the issue of feasibility, the bankruptcy court stated:

In its disclosure statement, Debtor states that it will sell the apartments in order to fund the plan and make distributions to its creditors. This is consistent with Debtor's business, namely, buying, refurbishing, and selling properties for a profit. Based on the testimony of Debtor's witnesses, we find it reasonable that Debtor's reorganization would be effective and feasible. Also, because the disclosure statement provides for the sale of the apartments to fund the plan, the apartments are necessary to an effective reorganization.

8. Remand is not necessary where the basis for the bankruptcy court's decision is sufficiently clear. *In re Muncrief*, 900 F.2d 1220, 1224 (8th Cir.1990); *In re Neis*, 723 F.2d 584, 588 (7th Cir.1983); *In re Legel, Braswell Gov't Secur. Corp.*, 648 F.2d 321, 326 n. 8 (5th Cir. Unit B 1981).

as eight to twenty years. The debtor has indeed been trying for 10 years to sell these apartments. The value of the apartments, furthermore, continually deteriorates because of the predicament caused by the stay. The Cooperative is unable to meet its obligations or to maintain the building properly. Its inability, because of the bankruptcy stay, to enforce its rights against the collateral, pushes it continuously closer to bankruptcy. The disastrous economic predicament of the Cooperative further undermines the value of the apartments in the building, which are the collateral. The plan fancifully provides that additional "limited funding" will be provided by an unnamed "third party." There is no evidence that convincingly supports the availability or sufficiency of such funding.

What this plan essentially provides is that the Cooperative, whose debt is secured by the 106 apartments, will stand unpaid and hog tied for many years, almost certainly being driven into bankruptcy, while the debtor maintains ownership of the Cooperative's collateral hoping that real estate values will rise sufficiently to eventually permit payment of the Cooperative with equity remaining for the debtor.

There is no showing that the sale of the brownstones will produce a surplus over the affiliates' debt sufficient to cover the debt to the Cooperative. The reference to additional funds being provided by an unnamed third party is not shown to have any substance.

The most significant factor of this speculation is that the Cooperative bears *all* the risk. The debtor, having no equity in the collateral, cannot be harmed by the turns of the market. As it has zero equity now, even if the market goes down, the debtor's equity will remain the same. If, on the other hand, the real estate benefits from a boom, the rise in value could conceivably be sufficient to pay the Cooperative and give the debtor some equity profits. Essentially, what the plan provides is that the debtor is permitted to gamble with the Cooperative's money. Heads I win; tails you lose.

The bankruptcy petition was filed on January 4, 1991, to stay the judgment of the New York state court, enforcing the Cooperative's lien on the apartments. For nearly two and one half years, the stay has been maintained over the Cooperative's protest, depriving the Cooperative of the funds it needs to meet its own obligations. Even assuming that such a plan might have passed the standards of § 362(d)(2) in the early days of the Bankruptcy Court's supervision, 2½ years later it is woefully inadequate. *See In re Ritz–Carlton*, 98 B.R. at 172; *In re Grand Traverse*, 150 B.R. 176, 183.

Moreover, the debtor has shown no reason why the collateral is necessary for an effective reorganization under the protection of the stay. The debtor's plan could just as easily be carried out by lifting the stay and allowing the creditors to foreclose. Instead, the debtor proposes that the creditors bear all market risks over an extended period of time while the debtor hopes for a windfall resulting from changes in market conditions.

At this late stage, the debtor's burden of showing feasibility is a heavy one. The maintenance of the stay for 2½ years has forced the Cooperative to the break of bankruptcy. The debtor's entitlement to a breathing spell does not justify long term disregard of its obligations, to the immense prejudice of its creditors. It is clear that no effective reorganization is "in prospect." It is not consistent with a reasonable exercise of discretion to further maintain the stay under these circumstances. Doing so merely permits the debtor to speculate with the creditor's interests.

The Cooperative is therefore entitled to have the stay lifted. *See e.g., In re Ritz–Carlton of D.C., Inc.*, 98 B.R. 170 (S.D.N.Y.1989) (Walker, J.) (remand as to whether plan actually "in prospect"); *In re East–West Assocs.*, 106 B.R. 767, 774–75 (S.D.N.Y.1989) (same); *In re New Era Co.*, 125 B.R. 725 (S.D.N.Y.1991) (lifting stay where plan merely "pipe dreams"); *In re Diplomat Electronics Corp.*, 82 B.R. 688 (Bankr.S.D.N.Y.1988) (lifting stay where plan is unrealistic); *In re Broad Assocs. Ltd. Partnership*, 110 B.R. 632 (Bankr. D.Conn.1990) (lifting stay where plan un-

feasible), *aff'd mem.*, Dkt. 90–170, 1990 WL 293699 (D.Conn., July 20, 1990) (Cabranes, J.); *In re 6200 Ridge, Inc.*, 69 B.R. 837, 844 (Bankr.E.D.Pa.1987) (lifting stay where debtor had no equity in its only asset); *In re Park Timbers, Inc.*, 58 B.R. 647, 651 (Bankr.D.Del.1985) (lifting stay because the debtor had shown only that "it wants to forestall foreclosure so that the property can be sold on the market. It does not have capital to cure the waste and defaults. All it has is hope that it can be sold and in the interim wants [the creditor] to bear all the risks."); *In re Certified Mortg. Corp.*, 19 B.R. 369 (Bankr.M.D.Fla. 1982) (debtor may not "use the automatic stay indefinitely as a refuge" while leaving the creditor to the risk of the market); *see also* S.Rep. No. 95–989, 95th Cong., 2d Sess. 5, 53 (1978), *reprinted in,* 1978 U.S.Code Cong. & Admin.News 5787, 5791 ("In cases where the single asset of the debtor is real property, the court shall grant relief from the stay if the debtor has no equity in the collateral, thereby allowing the creditor to proceed with his foreclosure."); *see also, id.* at 5839.

■ As a second point, the Cooperative contends that the automatic stay should have been vacated under 11 U.S.C. § 361 & 362(d)(1) for lack of adequate protection to the Cooperative's interests. The bankruptcy court held that the declining value of the collateral was not attributable to the automatic stay but rather to "market forces," and thus the Cooperative could not obtain relief under the statute.

The debtor has the burden of proving that the creditor is adequately protected. The Cooperative asserts that the bankruptcy court failed to consider the increasing amount of its claim against the eroding value of the apartments. At the time of the debtor's bankruptcy filing, the Cooperative estimates that its claim was $1.0 million and the value of the collateral was $1.6 million. The Cooperative contends that its claim grew as the debtor continued to default on current maintenance payments, and as interest, fees and charges accrued.

The Cooperative argues that the debtor's maintenance defaults caused the Cooperative to increase its liabilities for real estate taxes, Local Law 10 and fire alarm repairs, legal fees, unpaid water and sewer charges, trade payables, etc., thus decreasing the value of the collateral. Experts at trial estimated that it would cost between $200,000 and $500,000 to bring the building into compliance with Local Law 10 and an additional $150,000 to $175,000 to bring the building into compliance with the fire code.

Finally, the Cooperative contends that the debtor's bankruptcy and the resulting financial disarray have further driven down the market value of the collateral. MHTCo. estimated the value of the apartments to be $1.7 million in October 1990. The Cooperative's experts estimated the value of the 106 apartments to be $1.6 million in October 1991, and $1 million as of February 1992.

The debtor argues that the issue to be determined in assessing the adequacy of protection is whether the value of the collateral is being diminished *as a result of* the stay.

In *United Sav. Ass'n v. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365, 370, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988), the Supreme Court stated that an "interest is not adequately protected if the security is depreciating during the term of the stay. Thus, it is agreed that if the apartment project in this case had been declining in value petitioner would have been entitled, under § 362(d)(1), to cash payments or additional security in the amount of the decline, as § 361 describes."

I find no basis in the Supreme Court's decision for the debtor's assertion that the decline in value must be attributable to the stay rather than to market forces. Accepting the Cooperative's estimates as true, as did the bankruptcy court, the apartments declined in value by over $600,000 from October 1990 to February 1992. The Cooperative is not adequately protected against this decline in value of its collateral. The

Cooperative has shown the declining value of its collateral from which it has no adequate protection.

Even if the debtor is correct in its argument that the decline in the value of the collateral must result from the stay, that condition is present here. It is clearly the case that the value of the collateral has been, and is being, diminished by the stay. The huge debt owed by the debtor leaves the Cooperative without necessary funds to discharge its obligation to maintain the building. The stay prevents it from realizing funds through access to the collateral. The Cooperative's growing insolvency, which results from the stay, adversely affects its ability to maintain the building and in turn adversely affects the value of the apartments. By reason of the helpless position and growing insolvency forced on the Cooperative by the stay, it is extremely unlikely that purchasers would be willing to invest in apartments in the building; the risk of doing so would be enormous. As the apartments are the collateral, it is clear that the value of the collateral is being harmed by the stay.

## Conclusion

The automatic stay is vacated pursuant to § 362(d)(2) because Associates has no equity in the apartments and the apartments are not necessary for an effective reorganization, as well as pursuant to § 362(d)(1), because the Cooperative's collateral is not adequately protected.

SO ORDERED.