**In re 1567 BROADWAY OWNERSHIP ASSOCIATES, Debtor.**

**Bankruptcy No. 96 B 42017 (JGK).**

United States District Court,
S.D. New York.

Nov. 7, 1996.

Helen Davis Chaitman, Ross & Hardies, Somerset, NJ, Joshua J. Angel, Angel & Frankel, New York City, for Appellant.

Charlotte M. Fischman, Marc A. Goodman, Kramer, Levin, Naftalis, Nessen, Kamin & Frankel, New York City, for Respondent.

Jeffrey C. Chancas, Borah, Goldstein, Altschuler & Schwartz, New York City, for Receiver.

## OPINION AND ORDER

KOELTL, District Judge:

On September 27, 1996, the United States Bankruptcy Court for the Southern District

of New York (Gallet, J.) ordered the lifting of the automatic stay imposed by section 362(a) of the Bankruptcy Code to allow Banque Nationale de Paris ("BNP") to complete its foreclosure sale of property owned by 1567 Broadway Ownership Associates ("the debtor"). This property, the premises located at 1567–69 Broadway in New York City ("the property"), is the sole asset of the debtor. The debtor has moved, pursuant to Rule 8005 of the Federal Rules of Bankruptcy Procedure, for a stay of the bankruptcy court's order pending its appeal of that order. The bankruptcy court has previously denied the debtor's motion to stay its order.

## I.

In March, 1989, BNP extended three consolidated loans to the debtor to finance the acquisition of the property and to develop it into a food court and other restaurants. (Affidavit of Lowell R. Rabinowitz, Senior Vice President of BNP ("Rabinowitz Aff.") at ¶ 3). These loans were guaranteed by three of the debtor's general partners, National Restaurants Management, Inc., Elie Hirschfeld and Arthur H. Cohen (collectively "the guarantors"). (Id.). The debtor ultimately took in a fourth partner. (Id. at ¶ 4).

In March, 1993, BNP commenced a foreclosure action in New York Supreme Court which also sought deficiency judgments against the guarantors. (Id. at ¶ 6). On March 3, 1994, BNP obtained an order from the state court granting partial summary judgment, finding, among other things, that BNP had lent the debtor and the guarantors a total of approximately $26 million and that BNP was within its right in seeking foreclosure against the debtors and guarantors. (Exhibit A to Rabinowitz Aff.). This grant of partial summary judgment was affirmed by the Appellate Division, First Department on April 11, 1995. (Exhibit B to Rabinowitz Aff.). On October 17, 1994, BNP obtained a judgment of foreclosure in the amount of $40,687,552 plus interest accruing after April 1, 1994 at the rate of $19,674 per diem. (Order and Judgment of Foreclosure and Sale, attached as exhibit C to Rabinowitz Aff.).

After judgment was entered, the parties entered into settlement negotiations. As a precursor to those negotiations, the parties signed pre-workout agreements which stated that the settlement discussions would not be binding if they did not result in a signed writing, that BNP made no representations or assurances in connection with the settlement discussions, and that settlement negotiations could be terminated at any time, without either cause or notice. (Pre Work–Out Agreement, attached as Exhibit D to Rabinowitz Aff.).

The debtor asserts that during its negotiations with BNP it was led to believe that an agreement had been reached between the parties. The debtor argues that this settlement provided for the release of the debtor and the guarantors from their obligations to BNP. In return, the debtor and guarantors would agree to transfer the property to BNP, pay a sum of money to BNP, and agree to cooperate in litigation against one of the property's tenants for failure to pay rent.

BNP agrees that such negotiations were ongoing, but asserts that there were numerous significant disagreements between the parties over the terms of the settlement. (Rabinowitz Aff. at ¶ 13). Thus, BNP contends that there was never an agreement between the parties on the essential terms of a deal and there was never any intent to be bound to any settlement proposal. BNP further asserts that no agreement was ever executed, finalized or fully documented by BNP, or approved by its senior management in Paris. (Id.). That there was no signed writing or final written agreement is not contested by the debtor. BNP states that after considering the settlement proposals it decided not to consent to a settlement, because it could not get the approval of Banco Espirito, its participant. (Id. at ¶ 14).

An involuntary petition on the debtor's behalf was filed on April 17, 1996, several days after BNP indicated it did not wish to continue settlement discussions and one day before BNP sought to conduct a foreclosure sale on the property. (Rabinowitz Aff. at ¶ 15). On May 30, 1996, the debtor filed an adversary proceeding against BNP, asserting that BNP's claims should be equitably subor-

dinated and seeking monetary damages against BNP. (Id. at ¶ 16). The debtor's claims are based on BNP's alleged inequitable conduct during the settlement negotiations. (Id.).

On September 27, 1996, the bankruptcy court, after conducting a twelve day trial, granted BNP's motion to lift the automatic stay imposed by section 362(a) of the Bankruptcy Code and to allow BNP to complete its foreclosure sale of property owned by the debtor. (Transcript of September 27, 1996 hearing before the Honorable Jeffrey H. Gallet, United States Bankruptcy Judge ("Tr.") at 1441). In granting the motion to lift the automatic stay, the bankruptcy court stated that "no finding that I make in this case is res judicata or meant to be [binding] on the adversary proceeding." (Id. at 1412). The bankruptcy court also noted that the motion was being tried without discovery and in a summary fashion. (Id.).

The bankruptcy court first decided whether the parties had entered into a binding settlement agreement. (Id. at 1419). The bankruptcy court found that "[t]he correspondence in this case doesn't support the theory that the deal was done." (Id. at 1430). Specifically, the bankruptcy court pointed to an August 8, 1995 memorandum prepared by BNP's attorney. That memorandum explicitly provided that the settlement agreement is "subject to the approval of" both BNP's management and its participant bank, Banco Espirito. (Id.; August 8, 1995 memorandum, attached as Exhibit 15 to Affidavit of Robert A. Abrams ("Abrams Aff."). The bankruptcy court found that this memorandum, and the other correspondence in the case, showed that the parties did not intend to be bound by the draft settlement proposals. (Tr. at 1430).

The bankruptcy court also rejected the argument that BNP had violated any duty of disclosure to the debtor or had misled the debtor. (Tr. at 1432). The bankruptcy court found that BNP did in fact hope to reach a settlement, and was prepared to compel Banco Espirito to go along. (Id.) The bankruptcy court found no evidence that BNP continued to negotiate after it had decided not to settle with the debtor. (Id.).

The bankruptcy court then determined the value of the property. The bankruptcy court considered the reports of both parties' appraisers. (Id. at 1435). The bankruptcy court concluded that the property was worth between $20–30 million. (Id. at 1437). The bankruptcy court also found that the debtor and guarantors currently owed BNP in excess of $50 million. (Id. at 1440 (stating that the debtor and guarantors owed BNP "somewhere in the middle of $50 million now")).

The bankruptcy court then examined whether the debtor could reorganize. (Id. at 1439). The bankruptcy court found that the debtor could only reorganize if it won its adversary proceeding and was able to equitably subordinate or reduce BNP's claims. (Id.). The bankruptcy court explicitly stated that it was not finding that the adversary proceeding was meritless. (Id. at 1440). The bankruptcy court did state however, that it did not believe that the debtor's debt would be sufficiently subordinated or reduced. (Id. at 1440–41). The bankruptcy court found that the liability of the debtor, even should some of the debtor's debt be subordinated or reduced, would exceed debtor's equity in the property. (Id.).

Based on these findings, the bankruptcy court lifted the automatic stay. The debtor then petitioned the bankruptcy court for a stay of the lifting of the automatic stay pending appeal. (Id.). The bankruptcy court refused to grant the stay, but gave the debtor the opportunity to go directly to the district court to seek a stay. (Id. at 1441–42). The debtor then filed this appeal and sought a stay of the bankruptcy court's order lifting the stay pending a hearing of the appeal.

## II.

Rule 8005 of the Federal Rules of Bankruptcy Procedure provides that a motion for a stay of a Bankruptcy Court order may be made to the District Court pending appeal of the order. See Fed.R.Bankr.P. 8005. To obtain a stay, the debtor must show (1) a strong likelihood of success on the merits of the appeal; (2) that the movant will suffer irreparable injury if the stay is denied; (3) that no substantial harm will be suffered

by the creditor if the stay is granted; and (4) that the stay is in the public's interest. *See In re Crosswinds Assocs.,* 1996 WL 350695 at *1 (S.D.N.Y. June 25, 1996); *In re Advanced Mining Systems, Inc.,* 173 B.R. 467, 468 (S.D.N.Y.1994). Failure to satisfy any one of these criteria is fatal to the debtor's motion. *See Crosswinds,* 1996 WL 350695 *1; *Advanced Mining,* 173 B.R. at 468. Therefore, when a debtor facing imminent foreclosure of real property seeks to stay the foreclosure sale pending appeal of an order lifting the automatic stay, courts have refused to stay that order when the debtor could not demonstrate a strong likelihood of success of appeal. *See Crosswinds,* 1996 WL 350695 *1; *Green Point Bank v. Treston,* 188 B.R. 9, 12 (S.D.N.Y.1995).

To satisfy the first requirement, a strong likelihood of success on the merits of the appeal, the debtor must show that the bankruptcy court incorrectly lifted the automatic stay. The bankruptcy court's findings of fact are reviewed by this Court under a "clearly erroneous" standard, while the bankruptcy court's conclusions of law are reviewed de novo. *See In re Ionosphere Clubs, Inc.,* 922 F.2d 984, 988–89 (2d Cir.1990), *cert. denied,* 502 U.S. 808, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991); *see also Crosswinds,* 1996 WL 350695 *1; *Green Point,* 188 B.R. at 11.

A bankruptcy court, in determining whether to lift the automatic stay, must consider whether the requirements of Section 362(d) of the Bankruptcy Code have been met. The stay can be lifted if "the debtor does not have an equity in such property" and "such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2).[1] The party seeking to lift the stay "has the burden of proof on the issue of the debtor's equity in the property." 11 U.S.C. § 362(g)(1); *see also In re 160 Bleecker Street Assocs.,* 156 B.R. 405, 410 (S.D.N.Y.1993). However, the debtor has "the burden of proof on all other issues." 11 U.S.C. § 362(g)(2); *see also United Savings Assoc. of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 376–77, 108 S.Ct. 626, 632–33, 98 L.Ed.2d 740 (1988).

In this case, in considering whether the debtor had an equity interest in the property, the bankruptcy court first determined the value of the property. After weighing the evidence provided by both sides and the report of each parties' appraiser, the bankruptcy court determined that the property was worth between $20–$30 million. This figure fell between the estimates given by the two sides. The debtor has not argued that this factual finding was clearly erroneous.

The bankruptcy court also found that the debtor's liability to BNP was in excess of $50 million. The debtor has also not argued that this figure was clearly erroneous. Given the appraisals submitted to the bankruptcy court and the value of the debt, the findings of the bankruptcy court were not clearly erroneous. Thus, the sole asset of the debtor, although worth between $20–$30 million, is encumbered by debt such that the debtor is at least $20 million short of having any equity in the property.

However, the debtor argues that it does in fact have equity in the property because BNP's claims against it should be reduced, based either on the doctrine of equitable subordination or because of the other claims the debtor raises against BNP. The debtor asserts that based on these claims its obligations to BNP will be reduced below value of the property. Therefore, according to the debtor, whether it has equity in the property cannot be determined without resolution of these adversarial claims.

---

1. Alternatively, the stay can be terminated "for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1). The debtor argues that the bankruptcy court erred in determining that the creditor lacked adequate protection. Although the bankruptcy court did state there was "no adequate protection," this conclusion was stated in the context of considering whether the debtor had equity in the property. In any event, the bankruptcy judge clearly granted a stay based on the debtor's lack of equity in the property, and the inability of the debtor to reorganize. As will be discussed below, this ruling was clearly correct. This absence of equity and inability to reorganize provides an independent ground, under Section 362(d) of the Bankruptcy Code, to lift the automatic stay. Thus, whether BNP is adequately protected, or whether the bankruptcy court lifted the stay based also on this ground is irrelevant to the debtor's likelihood of success on the merits.

■ Whether the property is "necessary to an effective reorganization" also depends on the resolution of both the debtor's equitable subordination claims and the other grounds upon which the debtor seeks reduction of its debt to BNP. If a debtor cannot show that reorganization is possible, that debtor cannot show that the property is necessary for an effective reorganization. *See United Savings Assoc.*, 484 U.S. at 376–77, 108 S.Ct. at 633–34 (burden on the debtor to show there is a reasonable prospect of a successful reorganization); *In re 160 Bleecker Street Assocs.*, 156 B.R. at 411 (same). At oral argument, BNP's counsel argued that the debtor owed so much money to BNP that reorganization was impossible. (Transcript of October 24, 1996 hearing at 37).

The debtor disputes that reorganization is impossible. At oral argument, counsel for the debtor argued that if BNP's claim were to be reduced by $10 million, through either equitable subordination or the imposition of damages against BNP, the property would be fully capable of paying the debt service. (Id. at 15). The debtor argues that BNP, during the proceedings before the bankruptcy court, acknowledged that the debtor could effectively reorganize if the debtor was successful on its adversarial claims. (Id. at 16). The bankruptcy court also found that the debtor's ability to reorganize depended on succeeding on its claims against BNP. (Tr. at 1439). An evaluation of the debtor's claims against BNP is therefore required to determine whether the debtor has shown that the property is necessary to its effective reorganization, the second prong of the test for lifting the automatic stay.

The debtor argues that because its adversarial claims needed to be resolved before the bankruptcy court could properly decide whether to lift the automatic stay, the bankruptcy court erred in lifting the stay without deciding the merits of these claims. The bankruptcy court declined to find that the adversarial claims were meritless, but it did determine that those claims were insufficient to provide a basis for the debtor to possess any equity in the property or to reorganize. Because it is these determinations made by the bankruptcy court about the debtor's ad-

versarial claims that are the subject of the appeal, to determine the likelihood of the appeal's success we turn to the merits of the debtor's claims.

## III.

■ "Equitable subordination, which is founded upon estoppel, is the doctrine invoked by the courts to deny equal treatment to creditors based on some inequitable or unconscionable conduct in which they have engaged, or a special position which they occupy vis-a-vis the bankrupt that justifies subordination of their claims." *In re Credit Industrial Corp.*, 366 F.2d 402, 408–09 (2d Cir.1966); *see also In re 80 Nassau Assocs.*, 169 B.R. 832, 837 (Bankr.S.D.N.Y.1994); *In re Teltronics Services, Inc.*, 29 B.R. 139, 167 (Bankr.E.D.N.Y.1983).

The debtor asserts that BNP's claims should be subordinated or reduced because of BNP's inequitable conduct during the two parties' settlement negotiations. While the debtor states claims both for equitable subordination, and for the reduction of its liability to BNP based on the awarding of damages against BNP, both types of claims are based on the same alleged inequitable conduct. Thus, the debtor's two types of claims will be considered together for the purpose of this motion.

According to the debtor, BNP engaged in inequitable conduct by breaching its alleged settlement agreement with the debtor, not meeting its obligations of good faith and fair dealing, and violating its duty to disclose material facts to the debtor. The debtor also argues that BNP's claim should be reduced because the debtor relied to its detriment on BNP's oral promises. BNP denies that any binding agreement was ever reached which modified the obligations of the debtor and the guarantors, and denies that it acted inequitably.

To prove that BNP breached its contractual obligation, the debtor must first prove that a legally enforceable agreement existed. The bankruptcy court made factual findings on this issue and determined that no binding contract existed. While these factual findings are reviewed only for clear error, the existence of a contract, given these factual

findings, is subject to de novo review. *Shann v. Dunk,* 84 F.3d 73, 77 (2d Cir.1996); *Ronan Assocs. v. Local 94–94A–94B, International Union of Operating Engineers, AFL–CIO,* 24 F.3d 447, 449 (2d Cir.1994).

■ "Ordinarily, preliminary manifestations of assent that require further negotiation and further contracts do not create binding obligations." *Dunk,* 84 F.3d at 77; *see also Teachers Insurance and Annuity Assoc. of America v. Tribune Co.,* 670 F.Supp. 491, 497–99 (S.D.N.Y.1987). "Nonetheless, [courts] have recognized that in some rare instances, if a preliminary agreement clearly manifests such intention, it can create binding obligations." *Dunk,* 84 F.3d at 77; *see also Tribune,* 670 F.Supp. at 497–99. Preliminary agreements are enforceable in two contexts. First, they are enforceable when the parties have agreed on all of the essential terms, and reducing the agreement to writing is a mere formality. *See Dunk,* 84 F.3d at 77; *see also Tribune,* 670 F.Supp. at 497–99. Second, preliminary agreements can be binding when the parties have settled on certain important issues and agree to bind themselves to negotiate in good faith and work out the remaining terms. *See Dunk,* 84 F.3d at 77; *see also Tribune,* 670 F.Supp. at 497–99.

The debtor argues that its preliminary contract negotiations with BNP, even though they were not reduced to a signed written preliminary agreement, formed a binding contract. However, the bankruptcy court explicitly found that the parties had not agreed on all of the essential terms of the contract. The bankruptcy court found that "[t]he correspondence in this case doesn't support the theory that the deal was done." (Tr. at 1430). Specifically, the court pointed to an August 8, 1995 memorandum prepared by BNP's attorney. That memorandum, on which the debtor relies for the existence of a binding agreement, explicitly states that the settlement agreement is still subject to the approval of BNP and Banco Espirito. (Id.; August 8, 1995 memorandum attached as Exhibit 15 to Abrams Aff.).

The court's ruling on this issue was clearly correct. The correspondence cited by the bankruptcy court shows that the agreement was still conditional on the approval of BNP officials. Thus, it cannot be considered a binding agreement subject only to memorialization in writing. Moreover, the pre-workout agreement specifically stated that the parties would not be considered bound absent a signed writing. Such an agreement demonstrates that the parties did not intend to be bound by the settlement negotiations. *See R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 75 (2d Cir.1984); *Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257, 262 (2d Cir.), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984).

Furthermore, the parties in this case, represented by numerous lawyers, continued to negotiate for months after the August 8, 1995 memorandum, and prepared drafts that actually varied the terms of the August 1995 outline. (See Comparison of August, 1995 Outline with Drafts of Settlement Agreement, attached as Exhibit F to Rabinowitz Aff.). Such continued negotiations would argue strongly against the existence of a binding contract in August 1995. *See Dunk,* 84 F.3d at 77; *see also Tribune,* 670 F.Supp. at 497–99. Thus, the debtor has not demonstrated the likelihood that a preliminary agreement existed that needed only to be formalized in writing, and the debtor has not shown a strong likelihood that a breach of contract action can be maintained against BNP.

■ Similarly, the debtor has not demonstrated that BNP breached an implied duty of good faith or fair dealing. There can be no breach of a duty of good faith under an agreement that does not exist. *See Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro,* 961 F.2d 1052, 1056 (2d Cir.1992); *Village on Canon v. Bankers Trust Co.,* 920 F.Supp. 520, 534 (S.D.N.Y.1996). An obligation of good faith and fair dealing can also arise when the parties intend to bind themselves to negotiate in good faith to work out the remaining terms of an agreement. *See Dunk,* 84 F.3d at 77; *see also Tribune,* 670 F.Supp. at 497–99. In this case, however, the pre-workout agreement stated that BNP made no representations or assurances in connection with the settlement discussions. The pre-workout agreement also provided

that settlement negotiations could be terminated at any time, without either cause or notice. The parties agreed not to be bound at all by the settlement negotiations or to rely upon them. The debtor has failed to demonstrate any agreement to negotiate in good faith. Indeed, the parties expressly disclaimed that they had any binding agreement.

■ The debtor also claims the BNP engaged in inequitable conduct by failing to inform the debtor that Banco Espirito was refusing to agree to the settlement. In the absence of a fiduciary duty, a duty to disclose arises only if "(1) one party makes a partial or ambiguous statement that requires additional disclosure to avoid misleading the other party ... or (2) one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V.,* 68 F.3d 1478, 1483 (2d Cir.1995); *see also Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank,* 731 F.2d 112, 123 (2d Cir. 1984).

BNP did not have any duty to disclose its disagreement with its participant, Banco Espirito. The August 8, 1995 memorandum, which outlined the settlement proposal that existed at that time, explicitly stated that the settlement was contingent on the approval of BNP's senior management and Banco Espirito, the participant. (August 8, 1995 memorandum attached at Exhibit E to Rabinowitz Aff.). Thus, the debtor knew that the settlement required Banco Espirito's approval.

Given these facts, the debtor cannot credibly claim that the mere willingness of BNP to negotiate caused the debtor to believe that Banco Espirito had already consented to the settlement. BNP itself had clearly not yet consented to the deal. Because BNP did not mislead the debtor about the need for Banco Espirito's approval, and because the debtor could not have been acting under mistaken information, BNP had no duty to disclose its disagreement with Banco Espirito. Moreover, the pre-workout agreements plainly put the debtor on notice that it could not rely on the settlement negotiations for any rights. The debtor cannot now pick out a piece of those negotiations, the role of Banco Espirito, and claim that it relied on the failure to disclose that fact.

■ Finally, the debtor argues that its settlement negotiations with BNP constituted an oral modification to the original lending agreements. Under New York law, when a party to a written agreement induces the other party's significant and substantial reliance upon an oral modification, that party can be estopped from denying the validity of that modification. *See Rose v. Spa Realty Assocs.,* 42 N.Y.2d 338, 344, 397 N.Y.S.2d 922, 927, 366 N.E.2d 1279, 1284 (1977); *see also Towers Charter & Marine Corp. v. Cadillac Ins. Co.,* 894 F.2d 516, 521 (2d Cir.1990); *Village on Canon v. Bankers Trust Co.,* 920 F.Supp. at 527 (S.D.N.Y.1996).

In this case, however, the debtor has not demonstrated that the parties in this case did in fact agree to a binding oral modification. Moreover, BNP cannot be said to have induced reliance by the debtor. In fact, the pre-workout agreements, which explicitly provided that BNP made no assurances to the debtor and would not be bound absent a written agreement, made it clear that the debtor could not rely on anything that was done or said during the settlement negotiations. Thus, the debtor has failed to show a likelihood of success on its claim for equitable estoppel, and has no basis to claim that BNP's claims should be reduced.

## IV.

The debtor has failed to show that BNP breached a contractual obligation to the debtor, failed to meet its obligations of good faith and fair dealing, violated its duty to disclose material facts to the debtor, or induced the debtor to rely on an oral modification. The debtor therefore has not demonstrated a likelihood of success in demonstrating inequitable conduct or the breach of any agreements with the debtor or the guarantors. In the absence of such conduct, neither the debtor's equitable subordination claims nor the other bases on which it seeks to reduce BNP's claims have any likely merit. Without success on these claims, the debtor would have no equity in the property and the prop-

erty is not necessary to an effective reorganization. Therefore, the bankruptcy court was correct in lifting the automatic stay.

Thus, the debtor has not shown a likelihood of success on the merits of its appeal of the bankruptcy court's decision to lift the stay. "The test for granting a stay under Federal Rule of Bankruptcy Procedure 8005 is conjunctive; each of its four requirements must be satisfied." *Crosswinds,* 1996 WL 350695 *2; *Advanced Mining,* 173 B.R. at 468; *see also In re Friedberg,* 1991 WL 259038 at *2 (S.D.N.Y. Nov. 25, 1991). The debtor's failure to demonstrate a likelihood of success of the merits, by itself, establishes that the bankruptcy court's order should not be stayed. Thus, it is unnecessary to consider whether the debtor has met the other three requirements for obtaining a stay. *See Crosswinds,* 1996 WL 350695 at *2. The motion for a stay is denied.

**SO ORDERED.**